**M-09-790**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

KAMAL Z. ABDALLAH,

          Defendant.

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(18 U.S.C. § 371)

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

          BRENDAN C. GRIFFIN, being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"), duly appointed according to law and acting

as such.

          Upon information and belief, there is probable cause to

believe that in or about and between June 2009 and August 2009,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, defendant KAMAL Z. ABDALLAH

did knowingly and willfully conspire and agree with others (i) to

employ devices, schemes, and artifices to defraud; (ii) to make

untrue statements of material facts and omissions of material

facts necessary in order to make statements made, in the light of

the circumstances under which they were made, not misleading; and

(iii) to engage in acts, practices, and courses of business which

would and did operate as a fraud and deceit upon persons,

directly and indirectly, by use of the means and
instrumentalities of interstate commerce and in connection with
the purchase and sale of securities, contrary to Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 17, Code of
Federal Regulations, Section 240.10b-5.

    (Title 18, United States Code, Section 371).

    The source of your deponent's information and the
grounds for his belief are as follows:

I.   Background

    1.   I have been a Special Agent with the FBI for
approximately five years. The facts set forth in this affidavit
are based on my personal knowledge, as well as information
obtained from the review of documents and recordings and
statements made to me by witnesses with knowledge of the relevant
facts. In the portions of this affidavit that describe the
contents of documents, recorded calls or statements of witnesses,
they are reported in substance and in part, unless otherwise
indicated. Because I submit this affidavit for the limited
purpose of establishing probable cause to arrest the defendant, I
have not set forth all facts known to me about this investigation
and case.

    2.   As discussed in more detail below, the defendant
KAMAL Z. ABDALLAH conspired with an individual (hereinafter "the

2

Co-conspirator") to place fraudulent buy orders for the common
stock of Universal Property Development Corporation, which trades
under the ticker symbol "UPDV," and of Alphatrade, which trades
under the ticker symbol "APTD." The purpose of the scheme was to
increase demand in the market for UPDV and Alphatrade, which
would thereby inflate the prices of these stocks, so that
ABDALLAH could sell UPDV and Alphatrade shares that he owned at
higher prices. In exchange for placing the fraudulent buy
orders, ABDALLAH agreed to pay the Co-conspirator cash kickbacks.

        3.    Both UPDV and Alphatrade are penny stocks, which
are low-priced stocks of smaller companies that usually have a
relatively low trading volume. Based on my training and
experience, I know it is relatively easy to create false demand
for penny stocks in order to manipulate a penny stock's share
price or to create sufficient demand for a penny stock so the
stock can be sold. An order to buy any stock will cause that
stock's share price to rise if the order is sufficiently large
enough. A stock manipulator can buy a relatively large number of
shares of a penny stock due to the relatively low share price,
thus increasing the price. The impact of the buy order is
magnified as a result of the penny stock's low trading volume
because there are relatively few sell orders that would otherwise
act to offset buy orders, at least in part. A manipulator can

                                3

also use a large buy order to create artificial demand for a stock with a low trading volume.

4.   As discussed in more detail below, in June 2009 and July 2009, the Co-conspirator fraudulently induced several brokerage houses to purchase a total of more than 200 million shares of UPDV.  Specifically, the Co-conspirator called each of these brokerage houses, falsely identified himself as an actual representative of a client of the broker in most cases, and placed orders to buy large blocks of UPDV stock.  After the brokerage houses purchased the stock, the Co-conspirator ceased contact with the brokerage houses and did not pay for the shares that he had caused the brokerage houses to purchase.  The Co-conspirator advised the defendant KAMAL Z. ABDALLAH about these purchases, and ABDALLAH sold his UPDV shares typically after the Co-conspirator's fraudulent purchases inflated UPDV's stock price.  ABDALLAH also paid the Co-conspirator a cash kickback for creating the fraudulent purchase activity.  In addition, ABDALLAH and the Co-conspirator agreed to inflate the price of Alphatrade through fraudulent buying activity, but have not done so to date.

II.   Probable Cause to Arrest

A.   The Co-conspirator's Calls to Brokerage Houses

5.   On or about June 22, 2009, the Co-conspirator placed several calls to a trader at Cantor Fitzgerald, a

4

brokerage firm, falsely identified himself as a trader from Fir Tree and placed buy orders for a total of 10 million shares of UPDV stock.  Pursuant to these calls, Cantor Fitzgerald purchased 10 million shares of UPDV.  After doing so, Cantor Fitzgerald was advised by Fir Tree that it did not make these purchase orders.

6.    On or about June 25, 2009, the Co-conspirator called Dinosaur Securities ("Dinosaur"), a brokerage firm based in New York City.  Dinosaur recorded the Co-conspirator's calls. On the calls, the Co-conspirator identified himself as a trader from Fox Hollow, which is an institutional client of Dinosaur. The Co-conspirator claimed his wife was going to the hospital to give birth to twins.  He placed a buy order for 10 million shares of UPDV.

7.    The Dinosaur trader placed the Co-conspirator on hold for several minutes while he attempted to execute the order to buy 10 million shares of UPDV.  During that time, the Co-conspirator engaged in telephone conversations with other persons, and the Dinosaur recording system captured the Co-conspirator's side of these conversations.  On one of the conversations, the Co-conspirator can be heard saying in part "[Y]ou should start seeing it.  Once you see ten, you're going to go and do it for me, all right? . . . I've got twenty in my hand."  I understand the meaning of these statements based on my

5

training, experience and conversations with other law enforcement officials with experience in investigating and prosecuting securities fraud. The Co-conspirator's statement "once you see ten" is an apparent reference to the order to buy 10 million shares of UPDV that he had just placed with Dinosaur. "See ten" is an apparent reference to the ability of those in the brokerage industry to view stock trades such as this order to buy 10 million shares of UPDV on commercially available computer databases soon after they take place. The Co-conspirator's statement that he had "twenty in [his] hand" refers to this pending trade and the order to buy 10 million shares of UPDV that he had caused Cantor Fitzgerald to execute three days earlier. With these two trades, the Co-conspirator caused recent purchases of a total of 20 million shares of UPDV, thus creating upward pressure on the price of UPDV. Once Dinosaur executed his 10 million share buy order, the Co-conspirator wanted the other individual "to go and do it for me" by starting to sell UPDV shares he already controlled at the higher price.

8.   After Dinosaur bought the 10 million shares, the Co-conspirator placed an order for an additional 8 million shares, which Dinosaur filled. On or about June 26, 2009, the Co-conspirator placed a third buy order for an additional 20 million shares of UPDV, which Dinosaur filled. Later that day,

6

Dinosaur received a call from a representative of Fox Hollow, who had noticed the purchases of a total of 38 million shares of UPDV in its account. The Fox Hollow representative stated that the trades were not authorized. The Dinosaur trader spoke with a representative of Fox Hollow and confirmed that the firm had not placed the buy orders.

9. On or about July 7, 2009, the Co-conspirator placed a call to Roth Trading, a brokerage firm. On the call, the Co-conspirator identified himself as a trader from Baupost, a hedge fund, and placed orders to buy a total of 80 million shares of UPDV. The Co-conspirator claimed that his wife was going to the hospital to give birth to twins, as did the Co-conspirator when he called Dinosaur on June 25. Roth Trading filled this order. After filling the order, Roth Trading called Baupost to obtain settlement instructions and learned that nobody at Baupost had placed these buy orders.

10. On or about July 8, 2009, the Co-conspirator placed a call to RBC Capital Partners, a brokerage firm, and falsely identified himself as a trader from Pequot, a hedge fund. The Co-conspirator placed orders to buy a total of 95 million shares of UPDV. The Co-conspirator again claimed that his wife was in the hospital to give birth to twins. RBC Capital Partners filled this order. RBC Capital Partners later learned that no

7

one from Pequot had placed this order.

B.   Information Received from a Confidential Source

11.   I have received information from a confidential
source (the "CS") that the defendant KAMAL Z. ABDALLAH conspired
with the Co-conspirator to commit securities fraud in placing the
fraudulent buy orders for shares of UPDV.  Specifically, the CS
stated, in substance, that ABDALLAH previously served as a
corporate officer for UPDV and owned a substantial number of UPDV
shares.  The CS further stated, in substance, that the Co-
conspirator was introduced to ABDALLAH as someone who could
generate buying into stocks that ABDALLAH owned on a consistent
basis.  The CS stated, in substance, that, as requested by the
Co-conspirator, ABDALLAH wired $3500 to the Co-conspirator before
the Co-conspirator placed his first fraudulent buy order on
ABDALLAH's behalf.  The CS stated, in substance, that after
receiving this payment the Co-conspirator agreed to generate
buying activity in UPDV's stock in exchange for a cash kickback
from ABDALLAH.  The CS stated, in substance, that ABDALLAH
initially paid the Co-conspirator $3500 for every 5 million
shares of UPDV that he caused to be purchased.  The CS further
stated, in substance, that ABDALLAH subsequently paid the Co-
conspirator 25% of the proceeds from ABDALLAH's sales of UPDV
after the Co-conspirator generated the buying activity.  The CS

8

also stated, in substance, that ABDALLAH and the Co-conspirator agreed to engage in the same scheme with another penny stock, the stock of Alphatrade, which trades under the ticker symbol "APTD."

12.   As discussed in more detail in the following sections, the CS's information about the defendant KAMAL Z. ABDALLAH's involvement in the scheme has been corroborated through toll records, trading records and recorded telephone calls and text messages between the Co-conspirator and ABDALLAH.

C.   Toll Records

13.   Agents obtained toll records for a cellular telephone subscribed to in the name of the Co-conspirator's wife at the Co-conspirator's home address for the period March 1, 2009 to June 30, 2009 (the "Co-conspirator Phone"). These toll records revealed that, on the three dates within this time period on which the Co-conspirator placed fraudulent buy orders, there were multiple contacts between the Co-conspirator Phone and a cellular telephone with number ending in 5726, which the defendant KAMAL Z. ABDALLAH used as the contact number for the utility bill for his home address (hereinafter the "ABDALLAH PHONE").

14.   Specifically, on the following dates, there were the following number of calls between the Co-conspirator Phone and the ABDALLAH PHONE:

9

- June 22, 2009 - 17 calls
- June 25, 2009 - 38 calls
- June 26, 2009 - 10 calls

### D.   Trading Records

15.   The government has received audit trail[1] and blue
sheet[2] data for the trading of UPDV stock from June 1, 2009 to
July 7, 2009.  As set forth below, these records show that the
defendant KAMAL Z. ABDALLAH sold millions of UPDV shares on each
of the days that the Co-conspirator fraudulently induced a
brokerage house to purchase UPDV stock.[3]

16.   As noted above, on June 22, 2009, the Co-
conspirator fraudulently induced Cantor Fitzgerald to purchase 10

---

[1]   An audit trail is a report generated by the Financial Industry
Regulatory Authority ("FINRA") which provides daily trading
activity for a particular stock, including time of trade,
brokerage firms involved, the number of shares involved and the
price of the transaction.

[2] Blue sheets are reports provided by clearing firms, i.e., a
brokerage firm which handles confirmation, delivery and
settlement of stock trades, which provides detailed information
about the trades cleared by the firm, including the name of the
customer involved in the trade, the customer's address and the
customer's account number.

[3]   The Co-conspirator induced a brokerage firm to purchase UPDV
stock on one occasion on a day outside the time period covered by
the audit trail and blue sheet data, i.e., 95 million shares by
RBC Capital Partners on July 8, 2009.  At present, the government
has no information about the defendant's UPDV trading activity on
that date.

million shares of UPDV.  That same day, the defendant KAMAL Z
ABDALLAH sold 5,370,300 shares of UPDV.

17.  As noted above, on June 25, 2009, the Co-
conspirator fraudulently induced Dinosaur to purchase a total of
18 million shares of UPDV.  Early that same day, ABDALLAH
purchased a total of 400,000 shares of UPDV in two trades.  The
purchase price for both of these trades was $0.0037.  Later that
day, ABDALLAH sold a total of 1,050,000 shares of UPDV at sales
price of $0.0040, and a total of 3 million shares of UPDV at a
sales price of $0.0043.

18.  As noted above, the Co-conspirator fraudulently
induced Dinosaur to purchase an additional 20 million shares of
UPDV on June 26, 2009.  That same day, the defendant KAMAL Z.
ABDALLAH sold a total of 4,210,690 shares of UPDV in two separate
trades.

19.  As noted above, the Co-conspirator fraudulently
induced Roth Trading to purchase 80 million shares of UPDV on
July 7, 2009.  That same day, the defendant KAMAL Z. ABDALLAH
sold a total of 2,419,700 shares of UPDV in two separate trades.

20.  In addition, the audit trail and blue sheet data
reflect that the defendant KAMAL ABDALLAH did not sell any UPDV
shares between June 22, 2009 and July 7, 2009, except as
indicated above.  In other words, the only dates on which

11

ABDALLAH sold UPDV shares during that time frame were dates on which the Co-conspirator successfully induced a brokerage firm to buy UPDV shares.

E.   Recorded Conversations and Intercepted Text Messages

21.   On or about July 21, 2009, the Co-conspirator used the Co-conspirator Phone to call the defendant KAMAL Z. ABDALLAH on the ABDALLAH PHONE.   I have listened to a recording of this call.   During the call, ABDALLAH, inter alia, advised the Co-conspirator of the amount of Alphatrade and UPDV shares that he wanted the Co-conspirator to purchase and the inflated stock price which ABDALLAH hoped to achieve through the Co-conspirator's buying activity.   The parties also discussed the amount and timing of the kickback that ABDALLAH would pay the Co-conspirator should he successfully induce others to buy shares in these stocks.

22.   Specifically, the Co-conspirator asked ABDALLAH how much Alphatrade he should buy and at what price.   ABDALLAH advised the Co-conspirator that he wanted the Co-conspirator to purchase a million shares of Alphatrade "up to 20."   Based on my training and experience and knowledge of the case, I believe that ABDALLAH instructed the Co-conspirator to buy enough shares to move the price of Alphatrade up to $0.20 per share to enable ABDALLAH to sell at that price.   The Co-conspirator then asked

12

the same questions with respect to UPDV, and ABDALLAH stated that the Co-conspirator should buy 25 to 50 million shares every other day. As to the price of UPDV, ABDALLAH instructed the Co-conspirator to "buy it all the way up to 45," i.e., move the price up to $0.0045 so that ABDALLAH could sell it at that price.

23. The Co-conspirator and ABDALLAH also discussed the Co-conspirator's kickback during the call. As to Alphatrade, ABDALLAH advised that he would pay the Co-conspirator a 25% kickback because he bought that stock, as opposed to being given the stock, and so he had a cost basis in the stock. ABDALLAH also stated, in substance, that he would pay the Co-conspirator a 25% kickback on the UPDV sales. ABDALLAH further stated, in substance, that if the Co-conspirator bought some stock that day, he would send the Co-conspirator the kickback in a wire transfer the following day.

24. On or about July 28, 2009, the Co-conspirator used the Co-conspirator Phone to call the defendant KAMAL Z. ABDALLAH on the ABDALLAH PHONE. I have listened to a recording of this call. During the call, ABDALLAH again requested the Co-conspirator to place buy orders for UPDV and Alphatrade to move the price higher in exchange for a cash kickback.

25. Specifically, the Co-conspirator asked ABDALLAH to explain what he wanted the Co-conspirator to do with Alphatrade.

13

ABDALLAH responded that Alphatrade was now being offered at
$0.025, but that if "we can sell this between 15 and 20 cents . .
. we'd have some cash." ABDALLAH further told the Co-conspirator
that if he could buy between 700,000 and one million shares of
Alphatrade "that should move it where we want to move it."
ABDALLAH requested that the Co-conspirator put in an order for
one million shares at a price of 20 cents per share.
As to UPDV, ABDALLAH requested that the Co-conspirator place buy
orders for UPDV up to $0.0045. ABDALLAH again confirmed that he
would pay the Co-conspirator a 25% kickback on the shares the Co-
conspirator helped him to sell.

        26.  On or about July 31, 2009, the Co-conspirator used
the Co-conspirator Phone to make and receive several recorded
telephone calls to and from the defendant KAMAL Z. ABDALLAH, who
was using the ABDALLAH PHONE. I have listened to a recording of
each of these calls. During these calls, ABDALLAH and the Co-
conspirator discussed the scheme to defraud with respect to UPDV.

        27.  Specifically, the Co-conspirator told ABDALLAH
that he was "ready to make some money." ABDALLAH stated, in
substance, that UPDV was currently trading at between $0.0023 and
$0.0025 per share. ABDALLAH also stated, in substance, that he
was hoping to sell his UPDV stock at a price of at least $0.0033
per share. The Co-conspirator asked ABDALLAH if he would lower

14

his sales price "so we can definitely make money today." ABDALLAH stated that "I'll have them come down . . . to 30 and above," i.e., he and other members of the conspiracy would sell their shares at a price as low as $0.0030 per share. The Co-conspirator asked ABDALLAH to drop his bottom price to $0.0028, and ABDALLAH agreed. The Co-conspirator also stated that "when I do it . . . and if it gets busted . . . I'll buy more. . . . In other words, you know how I'm doing it, like, I'm buying it and if they catch on to how I'm buying it . . . you guys don't tell them that you know me and we just shut up." ABDALLAH stated, in substance, that if he is able to sell his stock, he would pay the Co-conspirator the following day. The Co-conspirator stated, in substance, that he would buy approximately 25 million shares, which were worth approximately $50,000. The Co-conspirator further requested that ABDALLAH "get in there . . . make sure you're there because I don't want to waste my buying." ABDALLAH responded, in substance, that he would put in two sell orders for two million shares each at "27 and above."

28. On a subsequent call that same day, the Co-conspirator and ABDALLAH discussed the status of the purchase activity. The Co-conspirator advised ABDALLAH that "I've got to be cautious because of what I do" and that he was waiting for a telephone call. The Co-conspirator further stated that "I'm

talking out of my butt when I tell them whom I am and everything.
. . . I've got to pretend who I am."  ABDALLAH responded that he
understood.

      29.  Later that same day, the FBI intercepted the
following text message sent from the ABDALLAH PHONE to the Co-
conspirator Phone: "[a]re we doing more or that's it for the
day."  Shortly thereafter, the FBI intercepted another text
message sent from the ABDALLAH PHONE to the Co-conspirator Phone,
which stated "U wanna do 20 or 25 and let's see what happens."
Based on my training and experience and knowledge of the case, I
believe that ABDALLAH was inquiring whether the Co-conspirator
would be willing to place another buy order for UPDV if ABDALLAH
lowered his sales price to $0.0020 or $0.0025 per share.

      WHEREFORE, your deponent respectfully requests that a
warrant be issued for the arrest of defendant KAMAL Z. ABDALLAH
so that he may be dealt with according to law.  Your deponent
also requests that this affidavit and the arrest warrant for
defendant be sealed, except that the FBI may disclose this

16

affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendant.

 

BRENDAN C. GRIFFIN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_7_ day of August, 2009

17