# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 09-CR-717 (JFB)
_____

UNITED STATES OF AMERICA,

VERSUS

KAMAL ABDALLAH,

Defendant.

_____

**MEMORANDUM AND ORDER**
January 6, 2012
_____

JOSEPH F. BIANCO, District Judge:

On March 7, 2011, defendant Kamal Abdallah (hereinafter "Abdallah" or "defendant") was convicted following a jury trial of one count of conspiracy to commit securities and wire fraud, 18 U.S.C. §§ 1343, 1348 and 1349, one count of securities fraud, 18 U.S.C. § 1348, and one count of wire fraud, 18 U.S.C. § 1343.

On July 1, 2011, defendant moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, and for a new trial, pursuant to Federal Rule of Criminal Procedure 33(a). In his motion for a judgment of acquittal, defendant argues that venue in the Eastern District of New York ("EDNY") was not proper for the conspiracy charge, the securities fraud charge, or the wire fraud charge, and contends that the government manufactured venue as to each count. Defendant also claims that there was insufficient evidence to support the wire fraud charge. In his motion for a new trial, defendant seeks to overturn his conviction on the following four grounds: (1) there was a constructive amendment or prejudicial variance to the superseding indictment; (2) the government withheld witness statements in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (3) the government improperly introduced evidence of the defendant's prior bad acts in violation of Federal Rule of Evidence 404(b); and (4) the government misled the jury during its rebuttal summation.

For the reasons set forth below, the Court denies defendant's motion for judgment of acquittal and defendant's motion for a new trial in their entirety.

## I. Background

### A. Superseding Indictment

The grand jury returned a superseding indictment ("Superseding Indictment") against the defendant on August 17, 2010 in seven counts, including conspiracy to commit securities and wire fraud, substantive securities fraud, and five counts of wire fraud. The Superseding Indictment charged that between June 2009 and August 2009, the defendant paid Eric T. Seiden to create false demand for stock in Universal Property Development and Acquisition Corporation ("UPDV"), which inflated UPDV's share price. (Sup. Ind., ¶¶ 4-9.) Defendant and an individual named Roger Kainth then allegedly sold their UPDV stock at these artificially high prices. (Sup. Ind., ¶¶ 5, 9.) The indictment also alleged that, during a phone call that Seiden made to the defendant on July 28, 2009, while Seiden was in the EDNY, the defendant and Seiden discussed a scheme to manipulate the stock price of UPDV and another company called Alphatrade. (Sup. Ind., ¶ 11.) During that discussion, the defendant allegedly asked Seiden to place fraudulent trades for Alphatrade at a certain price in order to artificially inflate the price and allow defendant and Kainth to sell their stock. (Sup. Ind., ¶ 11.)

Before the trial began, the government voluntarily dismissed three counts of wire fraud on venue grounds, and proceeded at trial on Count One charging conspiracy to commit wire fraud, Count Two charging substantive securities fraud, and Count Seven charging wire fraud on or about July 28, 2009 (which was re-numbered as Count Three for purposes of the jury's consideration). The trial began on February 14, 2011 with the selection of the jury.

### B. The Trial

Familiarity with the trial record is presumed. However, the Court briefly summarizes below the evidence relevant to the instant motions. The evidence is construed in the light most favorable to the government, as required under Rule 29 of the Federal Rules of Criminal Procedure.

#### 1. Relevant Companies and Loans

The defendant was the CEO and Chairman of the Board of UPDV, an oil and gas services company. (Tr. 671, 1013-14.)[1] The defendant was also Chairman of the Board of Continental Fuels ("Continental"), an oil products-related company in which UPDV owned a controlling interest. (Tr. 677-78.)

In April 2007, Sheridan Asset Management, LLC ("Sheridan"), a commercial finance and investment management company, lent UPDV about $3.6 million. (Tr. 671-72.) In August 2007, Sheridan extended an additional $3.25 million to UPDV. (Tr. 675-77.) In December 2007, Sheridan lent Continental $5.5 million so that Continental could acquire Geer Tank Trucks, Inc. ("Geer"). (Tr. 677-79.) That same month, Sheridan extended Continental a $3 million line of credit. UPDV guaranteed the loan and the line of credit. (Tr. 680.)

In October 2008, UPDV stopped making payments to Sheridan on the $3.6 and $3.25 million loans and went into default on both. (Tr. 684-87.) That month, Continental stopped producing collateral reports to Sheridan. (Tr. 688.) Bank statements for Continental and UPDV show that $4 million was transferred on October 14, 2008 from Geer to Continental, then to UPDV. (Tr.

---

[1] "Tr." refers to the trial transcript.

693-94, 695-97; Gvt. Ex. 166.) On the same day, $3.5 million was transferred from UPDV to the defendant's personal bank account. (Tr. 699; Gvt. Ex. 165.) Defendant later acknowledged that he lost $3 million out of the $3.5 million that was transferred to his account by engaging in currency trading. (Tr. 699-700.) Because of defendant's actions, Geer was unable to pay its suppliers and began to bounce checks. (Tr. 701-02.)

In December 2008, defendant resigned from UPDV, Continental, and all related companies. At that point, UPDV owed Sheridan more than $14 million. (Tr. 704-06.)

## 2. Issuance of 600 Million UPDV Shares

On October 27, 2008, after the defendant had already taken the above-referenced money from Geer, he sent an email to UPDV's transfer agent asking the transfer agent to issue 600 million UPDV shares in the name of Mohamed Abdellatif Yassine. (Tr. 304-05, 1120; Gvt. Ex. 98.) The defendant asserted that the 600 million shares could be properly issued because he had converted into common stock some 15,000 shares of Preferred B stock that UPDV had issued to him on December 27, 2007. (Gvt. Ex. 98.) The defendant also requested that the stock certificates be sent by the transfer agent overseas to Al Mawarid Financial Services ("AM Financials") in Beirut, Lebanon. (*Id.*) The stock certificates were issued and sent overseas as instructed by the defendant. (*Id.*)

## 3. Defendant and Roger Kainth

Beginning in June 2009, defendant and Roger Kainth used different brokerage accounts to buy and sell UPDV shares between their respective accounts in order to artificially increase trading volume in UPDV stock. (Tr. 877-882; Gvt. Exs. 213, 214.) Between June 1 and June 19, 2009, defendant and Kainth bought or sold UPDV stock every day that the stock market was open, buying a total of over 30 million shares, and selling 28.5 million shares. (Tr. 881; Gvt. Ex. 215.) Moreover, their trading activity was very similar. For example, on June 4, 2009, defendant bought 3,921,500 UPDV shares in his Fidelity brokerage account, and sold 1,206,953 UPDV shares in his Ameritrade account. (Tr. 878; Gvt. Ex. 213.) Similarly, on June 1, 2009, Kainth bought a total of 424,999 UPDV shares in his E*Trade and Schwab accounts and sold 5,999,994 shares in his Schwab account. (Gvt. Ex. 214.) In addition, Kainth, who sold more shares than he bought, sent some of the proceeds of such sales to the defendant. (Tr. 893-97.) Finally, once the defendant was introduced to Seiden on June 18, 2009, and Seiden began fraudulently inflating the demand in the UPDV shares, defendant and Kainth ceased their pattern of buying and selling UPDV shares between their accounts, and began to almost exclusively sell their UPDV shares. (Gvt. Exs. 215, 218.)

## 4. Defendant and Eric Seiden

Defendant first spoke to Seiden during a phone conference on June 18, 2009. (Tr. 394-95.) Seiden told the defendant that he had a lot of relationships with people and could buy a lot of stock. (Tr. 398-99.) The defendant agreed to wire Seiden money if Seiden successfully procured buy orders for UPDV shares. Defendant also agreed to pay Seiden 25 percent of the purchase price of any of the UPDV shares that Seiden bought. (Tr. 400-01.) That same day, Seiden bought a few million UPDV shares, and defendant wired him $3,500. (Tr. 402-04; Gvt. Ex. 18.)

After June 18, 2009, Seiden continued to place buy orders in UPDV stock on the defendant's behalf. (Tr. 407-08.) To do so, Seiden called brokerage firms pretending to be various individuals from institutional investors who had existing accounts at the brokerage firms. (Tr. 408.) During these phone calls, Seiden would place buy orders into the accounts of the investors he was impersonating. Seiden placed fake buy orders on June 22, June 25, June 26, July 7, and July 8, 2009 at brokerage firms such as Cantor Fitzgerald, Dinosaur Securities, Roth Capital Partners, and Royal Bank of Canada Capital Markets. (Tr. 41-43, 70-74, 119-125, 134-35, 155-56.)

Between June 19 and July 10, 2009, defendant and Seiden communicated several times per day by phone and through text messages. (Tr. 404-05.) Through these communications, defendant told Seiden how many shares to buy, the price that UPDV shares were selling for at the time, and the price at which defendant wanted to sell the shares, which was "always above where the market was trading." (Tr. 405, 407, 411.)

On days that Seiden successfully placed a fake buy order, the defendant sold or attempted to sell UPDV stock. (Gvt. Ex. 216.) He also made multiple phone calls or text messages on those days, and wired money to Seiden on or around the days when Seiden placed the buy orders. (Gvt. Ex. 211; Tr. 287-88, 425-28, 431.)

For example, on June 22, 2009, which was the day Seiden placed fraudulent buy orders with Cantor Fitzgerald for 10 million UPDV shares, defendant sold about 5.3 million UPDV shares in his personal brokerage accounts. (Gvt. Ex. 216.) On that day, there were twenty-eight phone calls and text messages between the defendant and Seiden. (Gvt. Ex. 211.) In addition, the

defendant wired Seiden $3,500 on that day. (Tr. 425-46; Gvt. Ex. 18.)

On June 25 and 26, 2009, which were the days Seiden placed false buy orders with Dinosaur Securities for a total of 38 million UPDV shares, the defendant sold about 8.2 million UPDV shares in his personal brokerage accounts. (Gvt. Ex. 216.) On June 25, 2009, the defendant exchanged forty-five telephone calls and text messages with Seiden and, on June 26, 2009, they exchanged nineteen telephone calls and text messages. (Gvt. Ex. 211.) Moreover, defendant deposited $2,000 into Seiden's bank account on June 25, 2009, and Seiden received a payment of $9,800 on June 26, 2009, from one of defendant's companies. (Tr. 426-28.) Seiden also received another wire from the defendant in the amount of $5,000 on July 1, 2009. (Tr. 431.)

On July 7, 2009, which was the day Seiden put in a false buy order with Roth Capital Partners, defendant sold about 2.4 million UPDV shares in his personal brokerage accounts. (Gvt. Ex. 216.) On that day, Seiden and the defendant exchanged twenty-five telephone calls and text messages. (Gvt. Ex. 211.)

On July 8, 2009, which was the day that Royal Bank of Canada Capital Markets bought 95 million shares for Seiden based upon a false buy order, defendant tried to sell 30 million UPDV shares through an account at AM Financials in Lebanon. In particular, at 3:39 p.m., the defendant made a twelve minute call to AM Financials. (Tr. 852; Gvt. Ex. 212.) While the defendant was on the telephone with AM Financials, an order was placed by AM Financials to sell 30 million UPDV shares through another brokerage firm called Pinnacle. (Tr. 848-49; Gvt. Ex. 95.) Moreover, while the defendant was on the telephone with AM Financials, he also received two calls from Seiden, and

appeared to place AM Financials on hold to speak to Seiden. (Tr. 852; Gvt. Ex. 212.) AM Financials subsequently reported to Pinnacle that the sell order for 30 million shares was an unsolicited trade that was placed by one of its clients. (Tr. 620; Gvt. Ex. 96.) AM Financials described its client as a "heavy trader" who "work[ed] a lot on penny stocks" and who "also trades futures, currencies, oil, natural gas, et cetera." (Tr. 622; Gvt. Ex. 96.) In addition, AM Financials reported that its client was "a big shareholder in UPDV and [had] been trading the stock for more than a year." (Tr. 622; Gvt. Ex. 96.) The 30 million share trade was subsequently "busted," or cancelled, at the request of RBC, who had bought the AM Financials shares. (Tr. 614-16.) During his trial testimony, Seiden recalled that the defendant had told him that he received a call from one of his overseas traders about a cancelled trade, which had resulted from the compliance department of the brokerage firm stating there was a problem on the buy side of defendant's trade.[2] (Tr. 432-33.)

5. Kainth's Trades Between June 22, 2009 and July 8, 2009

The evidence at trial demonstrated that Roger Kainth sold UPDV shares in his brokerage accounts on days that Seiden made the false buy orders, including on June 22, June 25, June 26, and July 7, 2009. (Gvt. Ex. 217.) For example, Kainth made the following trades: (a) on June 22, 2009, Kainth sold 999,999 UPDV shares in his personal brokerage account; (b) on June 25,

2009, Kainth sold more than 10 million UPDV shares; (c) on June 26, 2009, Kainth sold 4.47 million UPDV shares; and (d) on July 7, 2009, Kainth sold approximately 8 million UPDV shares. (Gvt. Ex. 217.) Kainth also wired a portion of the proceeds from the UPDV shares to the defendant. (Tr. 893-96.)

6. In-Person Meeting in Texas Between Seiden and the Defendant

On July 15, 2009, Seiden flew to San Antonio, Texas, where defendant resided, to meet with defendant. (Tr. 436, 441, 998-99.) The defendant paid for Seiden's flight. (Tr. 437.) During the visit, the defendant and Seiden discussed putting in buy orders for UPDV and another company defendant owned shares in called Alphatrade. (Tr. 442-43, 445.) Later that day, Seiden told defendant his particular fraudulent technique for securing the buy orders. Specifically, Seiden told the defendant that he (Seiden) was telling brokerage firms that he had accounts there, when in fact he did not. (Tr. 446.) Seiden explained to the defendant that some buy orders failed because the firms figured out that Seiden did not have an account and refused to place the buy order. (Id.)

The next day, defendant asked Seiden to buy more stock for him. (Tr. 447-48.) Seiden said he was running out of firms to call, but the defendant agreed to provide Seiden with more names of people to call. (Tr. 448.)

Both before and after Seiden's trip to Texas on July 15, 2009, defendant bought Alphatrade shares in his personal brokerage account, including the following: (a) on July 14, 2009, defendant bought 420,000 Alphatrade shares at a cost of $11,385; and (b) on July 16, 2009, defendant bought another 50,00 shares of Alphatrade in his

---

[2] In addition to this unsuccessful trade, various records showed that AM Financials sold UPDV shares on other days that Seiden successfully placed false buy orders. (Gvt. Ex. 219.) For example, on June 26, 2009, approximately 4 million UPDV shares were sold from the AM Financials account, and a total of approximately 27.42 million UPDV shares were sold out of the AM Financials account on July 7, 2009. (Id.)

brokerage account at a cost of $1,555. (Tr. 903; Gvt. Ex. 36.)

### 7. Seiden's Cooperation and Subsequent Phone Calls

The FBI arrested Seiden on July 21, 2009. (Tr. 448.) On July 21, July 28, and July 31, 2009, Seiden made consensually recorded phone calls to the defendant. (Gvt. Exs. 4, 5, 6.) Seiden was located in the EDNY when he made the July 28, 2009 phone call. (Gvt. Ex. 5.) During these calls, defendant requested that Seiden continue placing fake buy orders for UPDV and for Alphatrade. In the July 21, 2009 call, for example, defendant told Seiden to buy 25 to 50 million shares of UPDV every other day and to try to raise the price of UPDV. (Gvt. Ex. 4.) In exchange, the defendant agreed to provide a kickback to Seiden of 25 percent of whatever shares they were able to sell. (*Id.*)

In the July 28, 2009 call, during which Seiden told the defendant that he was "still in New York," defendant told Seiden to put in buy orders for UPDV at up to $0.0045 per share, even though UPDV was trading between $0.0024 and $0.0028 per share. (Gvt. Ex. 5.) The defendant again mentioned that he would pay Seiden a kickback of 25 percent on all shares that were sold. (*Id.*)

In calls on July 31, 2009, the defendant and Seiden again discussed the UPDV buy orders. (Gvt. Ex. 6-9.) Seiden said "you know how I'm doing it" and agreed that if the brokerage firms realized how Seiden was buying the stock, defendant would not tell them that he knew Seiden. (Gvt. Ex. 6.) Seiden told the defendant that he had to be "cautious because of what I do." (Gvt. Ex. 8.) Seiden explained that he was talking "outta my, my butt when I tell them who I am and everything," and that he had to "pretend who I am." (*Id.* at 2, 3.)

In the two weeks or so after the July 31 phone calls, defendant sent multiple text messages to Seiden imploring him to contact him so they could keep working together. (Gvt. Ex. 10.) For example, on July 31, 2009, at 1:57 p.m., defendant sent a text message to Seiden stating: "Eric U wanna do 20 or 25 and let's see what happens." (Tr. 214; Gvt. Ex. 10.) On August 2, 2009, defendant sent Seiden the following text message: "Eric Let's chat to prepare for the week!?" (*Id.*) On August 3, 2009, defendant sent the following text message to Seiden: "Good morning eric, hope all is well call me let's put a strategy together." (Tr. 215; Gvt. Ex. 10.) On August 6, 2009, defendant sent Seiden the following text message: "Young man, call me let's make some money." (Tr. 219; Gvt. Ex. 10.) On August 10, 2009, defendant sent the following text to Seiden: "What's going young man please call me, let's do something here." (Tr. 221; Gvt. Ex. 10.)

### 8. Defendant's Testimony

At trial, defendant testified on his own behalf. (Tr. 998-1383.) During that testimony, the defendant testified in detail as to the circumstances that led to his transactions with Seiden and denied any knowledge that Seiden was fraudulently inflating the price of stocks.

### 9. The Verdict

On March 7, 2011, the jury found the defendant guilty on all three remaining counts of the Superseding Indictment – namely, Counts One, Two, and Seven.

### C. The Post-Trial Motions

By letter filed May 10, 2011, defendant Abdallah requested that he be allowed to proceed *pro se*. On July 1, 2011, following a hearing pursuant to *Faretta v. California*,

422 U.S. 806 (1975), the Court granted Abdallah's application to proceed *pro se* and, with the consent of Abdallah, his former counsel was appointed to be his legal advisor.

On July 1, 2011, Abdallah filed a motion for judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and a motion for a new trial, pursuant to Rule 33 of the Federal Rules of Civil Procedure. On August 11, 2011, the government filed its opposition to Abdallah's motions. On August 26, 2011, Abdallah filed his reply. On September 15, and 21, 2011, the Court heard oral argument on the motions. At oral argument on September 21, 2011, the Court permitted Abdallah to file a supplemental document containing a chronology of events in connection with his motions. Abdallah also made additional submissions following the argument. The Court has fully considered the arguments and submissions of the parties.

## II.   DISCUSSION

### A.   Motion for Judgment of Acquittal

Defendant Abdallah filed a Rule 29(c) motion requesting a judgment of acquittal on the following grounds: (1) venue was improper on each of the three counts; and (2) there was insufficient evidence to support a conviction on the wire fraud count.[3] As discussed below, the Court finds each of these arguments to be without merit.

### 1.   Legal Standard

Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a). Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). However, as set forth below, "'[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307 (1979); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo*, 534 F.3d at 159; *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the

---

[3] Defendant made a Rule 29 motion at the close of the government's case based upon insufficient evidence and lack of venue. (Tr. 974-80.) The Court denied the motion orally, gave a summary of the Court's reasoning, and noted that this written opinion would follow. (Tr. 986-994.) The motion was renewed at the close of all the evidence. (Tr. 1401-10.) The Court again orally denied the motion. (Tr. 1411-12.) On the venue issue, defendant decided not to request a venue finding by the jury, but rather simply to rely on his argument, which was preserved for appeal, that venue was legally insufficient under Rule 29. (Tr. 1399-1400.)

defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that a court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury") (citations and internal quotation marks omitted).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (citation and internal quotation marks omitted); *accord United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own.") (quotation omitted). In examining the sufficiency of the evidence, the Court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "'[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000)) (internal quotation marks omitted; alteration in original). On the other hand, "'in passing upon a motion for directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Temple*, 447 F.3d at 137 (quoting

*United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

## 2. Challenges to Venue

Defendant Abdallah challenges venue on each of the counts. As discussed below, the Court concludes that venue existed in the Eastern District of New York for each of the counts based upon an interstate telephone call between the defendant and Seiden on July 28, 2009, while Seiden was in this District, during which the fraudulent scheme was discussed and Abdallah directed that Seiden make fraudulent purchases of Alphatrade and UPDV stock in exchange for a 25 percent kickback, so that Abdallah could sell his stock at the artificially inflated price caused by the fraudulent purchase.

### a. Applicable Law

Two provisions of the U.S. Constitution guarantee that the defendant must be tried in the place where the crime was committed. Article III, section 2, states, in relevant part, that criminal trials "shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment guarantees that a criminal defendant shall be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. In furtherance of these provisions, Rule 18 of the Federal Rules of Criminal Procedure requires that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. Moreover, in this Circuit,

> [T]here is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding . . . .

*United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985); *accord United States v. Royer*, 549 F.3d 886, 893 (2d Cir. 2008).

The government bears the burden of proving venue by a preponderance of the evidence. *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999); *United States v. Naranjo*, 14 F.3d 145, 146 (2d. Cir. 1994). Courts "review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting every inference that could have been drawn in its favor." *Smith*, 198 F.3d at 382 (quotations omitted).

Under 18 U.S.C. § 3237(a), venue properly lies in "any district in which such offense was begun, continued, or completed." The Second Circuit, "[a]pplying this rule to the continuing crime of conspiracy[,] . . . has held that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). Any "act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy" is an overt act, whether it is "innocent or illegal." *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011).

Phone calls can constitute overt acts in furtherance of a conspiracy. *See Rommy*, 506 F.3d at 120 ("It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy."); *Smith*, 198

F.3d at 382; *United States v. Naranjo*, 14 F.3d 145, 147 (2d. Cir. 1994); *see also United States v. Christo*, 413 Fed. App'x 375, 376 (2d Cir. 2011) ("the overt act can be something as simple as a phone call in furtherance of the conspiracy"). Moreover, it is not legally significant whether the defendant is the conspirator in the district where venue is being sought, or whether the defendant initiated or received the call; rather, phone calls into or out of a district can establish venue in that district so long as they further the ends of the conspiracy.[4] *See Rommy*, 506 F.3d at 120 (venue proper based on calls from undercover government agent inside the venue to out-of-venue defendant); *Smith*, 198 F.3d at 382 (venue proper based on co-conspirator's calls from inside venue to victim outside of venue); *Naranjo*, 14 F.3d at 147 (venue proper where defendant's out-of-venue co-conspirator made calls to inside-venue government informant); *United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993) (venue proper based on out-of-venue conspirator's phone call to inside-venue conspirator, even though charges against inside-venue co-conspirator were later dropped).

With respect to the offense of wire fraud,

18 U.S.C. § 3237(a) states that "[a]ny offense involving the use of the mails [or] transportation in interstate or foreign commerce . . . may be inquired of and prosecuted in any district from, through, or into which such commerce [or] mail matter . . . moves." 18 U.S.C. § 3237(a). The Second Circuit has held that this statute applies when determining the appropriate venue for wire fraud offenses. *United States v. Kim*, 246 F.3d 186, 191-92 (2d. Cir. 2001) (affirming district court conclusion that venue was proper in district where wires were sent and received because "the act of causing a wire to be transmitted in furtherance of a fraud is criminalized by the statute, and . . . a wire is 'transmitted' both where it was sent and where it was received"); *United States v. Gilboe*, 684 F.2d 235, 239 (2d. Cir. 1982) (telexes and phone calls to and from New York that defendant "caused," as well as transfer of proceeds of fraud through New York so that "such commerce" moved "from, through, or into" New York pursuant to 18 U.S.C. § 3237(a) properly conveyed venue).

Because "venue must be proper with respect to each count," the Court reviews each count separately. *Tzolov*, 642 F.3d at 318 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989); *United States v. Novak*, 443 F.3d 150, 161 (2d Cir. 2006).

b. Venue on Count One: Conspiracy

Defendant argues that venue for the conspiracy count did not lie in the EDNY. The government's evidentiary basis for venue in this District on the conspiracy count was the telephone call on July 28, 2009 between Seiden in Brooklyn and the defendant in Texas, during which the defendant attempts to have Seiden conduct another fraudulent trade of UPDV stock

---

[4] The Second Circuit has made clear that, although the *Reed* test is generally met when the defendant commits an overt act in furtherance of the conspiracy in the situs district, that may not be true in every case. *See Tzolov*, 642 F.3d at 321 n.5 ("[O]ur holding today in no way suggests that *Reed*'s substantial contacts test is inapplicable whenever a defendant commits an overt act in furtherance of the conspiracy in the situs district. We simply hold that under *Reed,* [the defendant's] acts are sufficient to establish venue."); *see also United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000) (noting that, although it is not a formal constitutional test, "[t]he substantial contacts rule offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial.").

(and also a new stock called Alphatrade) in order to inflate the value of the stock and allow Seiden to sell his shares at the artificially inflated price. Defendant contends that the conspiracy ended when Seiden was arrested in Florida by the FBI on July 21, 2009 and became a government cooperator, and therefore Seiden's post-arrest phone call to the defendant, at the direction of law enforcement, was not an "overt act in furtherance of the conspiracy." The government counters that the conspiracy continued because Roger Kainth was still a conspirator. Additionally, the government argues, the defendant's phone call urging Seiden to buy shares in order to drive up the stock price was in furtherance of the conspiracy. As set forth below, the Court agrees with the government and concludes that there was sufficient evidence to support a finding, beyond a reasonable doubt, that the conspiracy continued with the defendant and Kainth after Seiden's arrest, and that the July 28 telephone call between the defendant and Seiden was in furtherance of that conspiracy.

It is axiomatic that the continuation of a conspiracy can be proven by circumstantial evidence. *See United States v. Ortiz*, 394 Fed. App'x 722, 724-25 (2d Cir. 2010) (circumstantial evidence sufficient for a rational jury to infer defendant's participation in full duration of conspiracy); *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007) ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."); *accord United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008); *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). In fact, the Second Circuit has pointed out that "'a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" *Huezo*, 546 F.3d at 180 (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

Construing the evidence in the light most favorable to the government, there was sufficient evidence to support the continuation of the conspiracy after Seiden's arrest, based upon the ongoing efforts of the defendant and Kainth to pay Seiden to fraudulently inflate the stock value of UPDV shares through fake purchases of the stock, which would allow the defendant and Kainth to sell the UPDV stock at the fraudulently inflated stock. Although the government had no evidence that Seiden spoke directly to Kainth, the government introduced compelling evidence of Kainth's involvement in the scheme with the defendant based upon the timing of Kainth's trading activities, and the wiring of the proceeds of those sales by Kainth back to the defendant. In other words, the evidence admitted at trial shows that Kainth and defendant worked closely together to unload UPDV shares into Seiden's false buy orders between June 22 and July 8, 2009. (Gvt. Exs. 216, 217.) In particular, on nearly all of the same days that Seiden entered his illegitimate buy orders, the defendant and Kainth sold UPDV shares from their respective brokerage accounts. (*Id.*) Moreover, Kainth wired the proceeds of his UPDV sales to the defendant while the stock fraud scheme was ongoing. (Tr. 893-96.) The timing of these trades and payments to the defendant certainly would allow a jury to rationally infer that Kainth was a knowing participant in the scheme.[5]

---

[5] In addition to the trading records and bank records, there is also evidence of an ongoing scheme in the words of the defendant on the recorded conversations

Viewed in the light most favorable to the government, there was sufficient evidence for a jury to rationally conclude beyond a reasonable doubt that the conspiracy continued through July 28, 2009, the date that Seiden called the defendant. *See, e.g.*, *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001) ("Circumstantial evidence is a legitimate form of evidence in this Circuit, and in fact-intensive cases such as this, requiring careful examination of trading records and a myriad of public information, the jury is the appropriate body to determine a defendant's guilt or innocence."). Accordingly, defendant's venue challenge based upon purported termination of the conspiracy on July 21, 2011 is without merit.

Similarly, the Court concludes that the July 28, 2009 phone call was certainly in furtherance of the ongoing conspiracy. *See Rommy*, 506 F.3d at 120; *Smith*, 198 F.3d at 382. During the call, defendant told Seiden how many shares of UPDV and Alphatrade to buy, and told Seiden how high he wanted him to drive up the stock price. (*See* Gvt. Ex. 5.) The defendant also discussed paying Seiden a kickback for helping him manipulate the stock prices of UPDV and Alphatrade. (*Id.*) Thus, defendant clearly used the phone call with Seiden on July 28, 2009 as a means to further the conspiracy, albeit unsuccessfully.

To the extent that defendant argues that venue is insufficient because Seiden was a government informant in this District at the time of the call while defendant was never in the district, that argument is flatly contradicted by binding Second Circuit precedent. In particular, in *Rommy*, the Second Circuit explicitly held that "a telephone call placed by a government actor within a district to a conspirator outside the district can establish venue within the district provided the conspirator uses the call to further the conspiracy." 506 F.3d at 122. In *Rommy*, the telephone call at issue involved calls to and from a government actor in Manhattan to the defendant in the Netherlands. The Second Circuit explained:

> [W]e conclude that the critical factor in conspiracy venue analysis is not whether it is a conspirator or a government actor who initiates the call; nor does it matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third party. What is determinative of venue – as the district court emphasized to the jury – is whether the conspirator used the telephone call to further the objectives of the conspiracy.

> [ . . . ]

> What matters is that the conspirator speaks, not to hear the sound of his own voice, but to communicate to his listener because he thinks that, by doing so, he furthers a conspiratorial goal. Thus, the overt act may properly be understood to have occurred at the site where the listener receives the conspirator's message. That an instrument of commerce or technology permits the conspirator to communicate with his listener while physically removed from him does not alter the fact that the conspirator has committed an overt act at the recipient's location. It means simply

with Seiden. For example, in the July 28, 2011 conversation, when referring to trades that would be made following the fraudulent inflation of the stock share by Seiden, defendant uses the plural term "we," rather than "I": "If we can sell this between fifteen and twenty cents, then we'll, we'll have some cash." (Gvt. Ex. 5, line 41.)

that his communication is a continuing act, supporting venue in the district of its initiation as well as the district of its receipt.

*Id.*; *see also United States v. Gonzalez*, No. CR 10-00834 WHA, 2011 WL 500502, at *3 (N.D. Cal. Feb. 9, 2011) ("The holding in *Rommy* is also consistent with myriad decisions from other circuits that have found venue to be proper even if a defendant never set foot in the district in question but instead made telephone calls to and/or from one or more individuals in that district as a part of the conspiracy.") (collecting cases). Therefore, because the July 28 telephone call in the instant case was clearly in furtherance of the Abdallah/Kainth conspiracy based upon defendant's attempt to get Seiden to fraudulently inflate the UPDV stock price, it establishes venue on the conspiracy count even though Seiden (not defendant) was the one in this District and was working for the government at the time he initiated the call.

In addition, the Court concludes that defendant knew that the overt act (namely, the telephone call) was taking place in New York or, at the very least, it was reasonably foreseeable to him. *See Rommy*, 506 F.3d at 123 ("[T]he law does not require a defendant to have actual knowledge that an overt act will occur in a particular district to support venue at that location. At most, it asks that the overt act's occurrence in the district of venue have been reasonably foreseeable to a conspirator."). Here, during conversations between July 21 and the July 28 telephone call, Seiden had told the defendant that he was going to be in New York (using the false reason that his mother was in the hospital). (Tr. 453-54.) During that period of time, as supported by the telephone records, defendant attempted to contact Seiden in order to continue the

scheme. (Gvt. Exs. 10, 11, 12A and 12B.) In fact, on July 28, defendant sent as many as six text messages to Seiden before Seiden called him back. (Tr. 846; Gvt. Exs. 10, 12B.) Moreover, at the beginning of the telephone call at issue on July 28, 2009, Seiden explicitly told the defendant that he was "still in New York." (Gvt. Ex. 5, line 4.) After being told that Seiden was in New York, defendant continued the conversation and sought to have Seiden make fraudulent purchases of stock, in exchange for a kickback.[6] Thus, defendant clearly knew that Seiden was in New York when defendant tried to contact Seiden by telephone and then, when Seiden eventually did contact defendant on July 28, defendant used the telephone call to try to further the objective of his ongoing conspiracy with Kainth.

Finally, defendant's argument that the government failed to demonstrate "substantial contacts" with the district, pursuant to *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985), also fails. *See Tzolov*, 642 F.3d at 321 (describing "substantial contacts" rule). In the instant case, given the particular facts – where the defendant knew that Seiden was in New York, attempted to contact him, and then chose to engage in a telephone conversation with Seiden that was clearly in furtherance of the conspiracy to commit mail and wire fraud – the "substantial contacts" rule is satisfied. Under these circumstances, it was

---

[6] The defendant, after this call, also repeatedly attempted to contact Seiden by text message to have Seiden make fraudulent trades. *See* Gvt Ex. 10, July 29, 2009, Session 58 ("Good morning Eric hope it is gonna be a good day"); July 29, 2009, Session 73 ("Please give me a call."). These contacts were made by defendant even though Seiden continued to advise the defendant by text message that he was still with his sick mother (whom defendant believed was in New York). *See* Gvt. Ex. 10, July 29, 2009, Session 81 ("Have to call u ltrt. My mom is not doing good today").

not unfair or prejudicial for the defendant to be tried for this conspiracy in this District. *See, e.g.*, *Tzolov*, 642 F.3d at 321 (rejecting argument that defendant's flights out of JFK Airport did not satisfy *Reed*'s "substantial contacts" rule); *Rommy*, 506 F.3d at 120 (venue proper based on calls from undercover government agent inside the venue to out-of-venue defendant); *Smith*, 198 F.3d at 382 (venue proper based on co-conspirator's calls from inside venue to victim outside of venue); *Naranjo*, 14 F.3d at 147 (telephone calls in furtherance of the conspiracy satisfied "substantial contacts" rule). In short, based on the particular overt act that occurred in the District during the July 28, 2009 telephone call, the defendant's venue challenge on the conspiracy count under *Reed* fails.[7]

In sum, the Court concludes that venue was proper as to the conspiracy count.

c. Venue on Count Two: Securities Fraud

Count Two charged the defendant with securities fraud pursuant to 18 U.S.C. § 1348. Specifically, the Superseding Indictment alleges that "between June 2009 and August 2009, both dates being approximate and inclusive . . . the defendant . . . did knowingly and intentionally execute and attempt to execute a scheme and artifice (a) to defraud . . ." (Sup. Ind., ¶ 15.)

The defendant argues that venue for

---

[7] For the same reasons, as discussed in more detail *infra* Parts II.A.2.c. and II.A.2.d., the Court finds that the "substantial contacts" test is also satisfied in connection with Counts Two and Seven. In particular, having willingly attempted to contact Seiden while Seiden was in New York and then (when Seiden later contacted him) directing Seiden to place fraudulent trades during the July 28, 2009 telephone call that defendant knew Seiden was making while in New York, defendant cannot claim any unfairness or prejudice under *Reed* from being subject to prosecution in this District.

Count Two did not lie in the EDNY because only Manhattan and California based brokerage firms were victimized by the stock fraud scheme, and there was no buying or selling of UPDV shares in the EDNY. In response, the government asserts that, although Seiden did place calls to brokerage firms in Manhattan and California for fraudulent purchases of stock in connection with his scheme with Abdallah, those earlier acts are not the basis of the securities fraud charge in Count Two; instead, the defendant was charged in Count Two with securities fraud in connection with the telephone call Seiden made to the defendant on July 28, 2009, from the EDNY, during which the defendant directed Seiden to make additional fraudulent purchases of certain stocks in exchange for a 25 percent kickback to Seiden. As discussed below, the Court agrees with the government and concludes that the July 28, 2009 telephone call was certainly an attempt by the defendant to engage in securities fraud and, because that call was made from the EDNY, venue lies in this District for Count Two.

As noted *supra* Part II.A.2.a., under 18 U.S.C. § 3237, venue properly lies in "any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237. In this case, the attempted securities fraud began in Texas, but involved the EDNY because the defendant, knowing that Seiden was in New York at the time, gave specific directions to Seiden during the July 28, 2009 telephone call to fraudulently purchase stock at an inflated price, in exchange for a kickback. *See generally United States v. Motz*, 652 F. Supp. 2d 284, 290 (E.D.N.Y. 2009) (faxes sent into district sufficient to support venue for securities fraud charge under 18 U.S.C. § 1348).

Thus, this situation is clearly distinguishable from *United States v. Tzolov*,

642 F.3d 314, 319 (2d Cir. 2011).[8] In *Tzolov*, the only basis for venue by the government on the substantive securities fraud count was that the defendant and an accomplice traveled through JFK airport on their way to meeting with investors. *Id.* at 318. The Second Circuit concluded that "going to Kennedy airport and boarding flights to meetings with investors were not a constitutive part of the substantive securities fraud offense with which [the defendant] was charged," and thus this preparatory act did not create venue in the EDNY for the substantive securities fraud count. *Id.* at 319.

Here, in contrast, the telephone call between Seiden and the defendant was not a mere passing through EDNY at an airport or a preparatory act; rather, it was the very core act of the attempted securities fraud by defendant – namely, an attempt by the defendant to place a fraudulent trade through Seiden, as he had done many times prior to that date. For example, during the call, the defendant discussed the need to have Seiden place a fraudulent trade in Alphatrade to artificially inflate the price so Seiden could sell his stock, and then specifically directed Seiden to purchase a million shares of Alphatrade at twenty cents per share:

> SEIDEN: Wha What do you say – what do you want me to do with Alphatrade exactly?
>
> ABDALLAH: With Alphatrade you see now it's offered at two and a half cents. When it goes back to ten, it goes up to ten cents, fifteen cents. I have, I have uh two hundred thousand shares. If we can sell this between fifteen and twenty cents,

then we'll, we'll have some cash.

> SEIDEN: Okay, so what do you want me to do?
>
> ABDALLAH: Uh, say that again um?
>
> SEIDEN: What exactly do you want me to do so at least I know?
>
> ABDALLAH: If you, you know, if you could buy um anywhere from seven hundred thousand to a million shares of it, that should that should that should go with wherever we want to move it.
>
> SEIDEN: Like what – like, no, specifically, like how do you want to do it? I want to make sure that I can –
>
> ABDALLAH: Yeah.
>
> SEIDEN: – you know say yes to it.
>
> ABDALLAH: Yeah. A million shares at twenty cents.
>
> SEIDEN: What is it?
>
> ABDALLAH: A million shares at twenty cents if you could put the maximum order [UI] for twenty cents.

(Gvt. Ex. 5, at 3-4.)

The defendant then gave Seiden similar directions with respect to UPDV, in that Abdallah asked Seiden to put in buy orders for UPDV at up to $0.0045 per share, even though it was trading at between $0.0024 and $0.0028 per share:

> SEIDEN: What about um U-P-D-V?

---

[8] The Court notes that *Tzolov* is also distinguishable because the charge was under 15 U.S.C. §§ 78j(b) and 78ff, which has its own specific, more restrictive, venue provision.

ABDALLAH: U-P-D-V, if you – whatever orders you can put in between – up to forty-five cents. Zero zero four five, not forty-five cents. Zero zero four five.

SEIDEN: Okay. Where is that at? I haven't, I haven't even been watching it.

ABDALLAH: It's at twenty-four by twenty-eight. Yeah [UI].

(Gvt. Ex. 5, at 4.) Defendant told Seiden later in the conversation that he wanted to have Seiden do forty, fifty or sixty million shares of these purchases of UPDV stock. (Gvt. Ex. 5, at 6.) Moreover, the defendant told Seiden that his percentage, or kickback, for these fraudulent purchases would be "[t]weny-five percent . . . . Twenty-five on whatever I sell, um, um." (Gvt. Ex. 5, at 5.)

Thus, having given Seiden the name of the companies, the price for the fraudulent purchases by Seiden, and the number of shares, the only remaining act was for Seiden to turn around and place the fraudulent purchases in order to artificially inflate the prices of those stocks for defendant's later sales. In short, by attempting to execute these fraudulent trades through Seiden, who defendant knew was in New York at the time of the telephone call, defendant created venue for substantive securities fraud in this District. *See generally United States v. Svoboda*, 347 F.3d 471, 484 & n.13 (2d Cir. 2003) ("[W]e find that the execution of trades on the New York Stock Exchange and American Stock Exchange is sufficient to establish venue in the Southern District of New York. We note that this conclusion is consistent with a number of district court decisions in this Circuit that have upheld venue where the only relevant contact to the venue was that various trades were executed in the district.") (collecting cases).

In sum, the July 28, 2009 call constitutes an attempt to engage in securities fraud. The defendant gave specific directions about how to manipulate the price of UPDV and confirmed that he would pay Seiden a kickback from his sale proceeds. By directing Seiden during the July 28, 2009 telephone call from Brooklyn to Texas to place these fraudulent purchases of stock, defendant engaged in attempted securities fraud and venue lies for that fraud in this District.

d.  Venue on Count Seven: Wire Fraud

Count Seven (which was re-numbered for trial as Count Three) charged the defendant with wire fraud pursuant to 18 U.S.C. § 1343.[9] The defendant asserts that venue was not proper for this charge. Defendant's arguments regarding Count Seven are very similar to his arguments concerning Count Two. *See* Defendant's Motion for Judgment of Acquittal, at 4 ("The defendant never travelled to the Eastern [D]istrict of New York; Defendant never telephoned anyone in the Eastern District of New York except the government

_____

[9] The full statute reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

informant Eric Seiden who initiated the call on July 28, 2009 to the defendant in San Antonio, Texas. This is the only contact that defendant had with the Eastern District of New York. This one telephone call on July 28, 2009 is not sufficient to establish Venue for the crime alleged in Count Three of the indictment."). As set forth below, defendant's venue challenge to the wire fraud offense, like the challenge to Count Two, fails because venue lies for the wire fraud in the districts that are at either end of the call regardless of whether defendant is in the district or whether defendant initiated the call.

It is axiomatic that an interstate telephone call, during which defendant discusses the fraudulent scheme and directs his accomplice to place fraudulent stock orders to further the scheme, constitutes the crime of wire fraud. It is equally well settled that venue lies for that crime at either end of the telephone call – namely, the district where the call originated or the district where it was received. *See, e.g.*, *United States v. Kim*, 246 F.3d 186, 191, 192-93 (2d Cir. 2001) (affirming district court's conclusion that a wire is "transmitted" for purposes of the wire fraud statute both where it was sent and where it was received, and noting that "we reject the notion that the very wires which caused the fraud to bear fruit through payment by Chase Manhattan can be characterized as just passing through the Southern District"); *see also United States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005) ("wire fraud [is] a 'continuing offense,' as defined in § 3237(a), properly tried in any district where a . . . wire communication was transmitted in furtherance of [the] fraud scheme," and "[e]ach of [the] transmittals occurred both where it was sent and where it was received") (citations and quotations omitted). The Supreme Court made this

clear in the context of the mail fraud statute where it stated that venue may constitutionally exist "in the district where [a defendant] sent the goods, or in the district of their arrival, or in any intervening district." *United States v. Johnson*, 323 U.S. 273, 275 (1944).

In the instant case, the July 28, 2009 telephone call was clearly an interstate wire for the purpose of executing the fraudulent scheme that was transmitted *from* the EDNY to Texas. As such, venue was proper in the EDNY for the wire fraud charge.

To the extent that defendant argues that he must be present in this District for venue to exist for the wire fraud, the Second Circuit has rejected that argument. *See Kim*, 246 F.3d at 192 ("Here, [the defendant] caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that [the customer] paid its vendors from New York banks. The fact that he was not in Manhattan when he caused the wire transmissions does not eliminate the connection between [the defendant's] acts and the Southern District for the purposes of venue."); *accord United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982); s*ee also United States v. Martin*, 411 F.Supp.2d 370, 376 (S.D.N.Y. 2006) ("venue for the substantive wire fraud charge also lies in this district based on the acts of the [co-conspirator,]" even where defendant was not present in venue and there was no evidence defendant knew that co-conspirator was engaging in activity in furtherance of the conspiracy in the venue).

Accordingly, because defendant caused Seiden to call him (by texting him prior to the call), and because Seiden was in the EDNY at the time of his telephone call with the defendant, venue was proper on the wire

fraud offense in Count Seven.[10]

### e. Manufacturing Venue Claim

The defendant argues that the "government artificially created [v]enue" as to each count by having Seiden place a call from the EDNY on July 28, 2009 to the defendant, who was in San Antonio, Texas. As set forth below, assuming *arguendo* that a doctrine of manufactured venue exists, there is no basis for such a finding here because (1) Seiden was in New York at the time of the telephone call because his lawyer was here; (2) defendant reached out to Seiden prior to the telephone call knowing that Seiden was in New York; and (3) Seiden told the defendant at the beginning of the call that he was in New York and the defendant proceeded to discuss the scheme and give directions regarding fraudulent trades to Seiden.

In the Second Circuit, the concept of "manufactured venue" appears to have originated in a footnote in *United States v. Myers*, 692 F.2d 823, 847 n.21 (2d Cir. 1982). In that case, the court addressed a claim by appellants that the government manufactured venue for "ulterior reasons, primarily to enable the Eastern District prosecutors to handle the trials." *Id.* The court rejected the argument, but noted that it did not "preclude the possibility of similar concerns if a case should arise in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue." *Id.*[11]

The Second Circuit has never vacated a conviction on the basis of manufactured venue. *See Rommy*, 506 F.3d at 127. Similarly, other circuits have rejected or at least questioned the doctrine of manufactured venue. *See United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (rejecting both manufactured venue and manufactured jurisdiction); *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995) ("There is no such thing as manufactured venue or venue entrapment." (internal quotation marks omitted)); *United States v. Spriggs*, 102 F.3d 1245, 1250 (D.C. Cir. 1996) (expressing reservations as to "manufactured venue"); *Andrews v. United States*, 817 F.2d 1277, 1279-80 (7th Cir. 1987) (observing that appropriate way to address prosecution venue shopping is through transfer pursuant to Fed. R. Crim. P. 21).

In any event, even assuming *arguendo* that the doctrine exists, there is no evidence in this case that the prosecution, "preferring trial" in the EDNY, "lure[d]" the individual to the EDNY "for some minor event simply to establish venue." *Myers*, 692 F.2d at 847 n.21. Seiden was in the EDNY for reasons independent of any purported attempt to manufacture venue. In particular, Special Agent Samantha Lockery, the agent who arrested Seiden, testified at trial that Seiden appeared in New York for a July 24, 2009 court appearance before a magistrate judge in the EDNY. (Tr. 262.) At that time, he was appointed counsel whose office was located in Brooklyn. (Tr. 290-91.) The FBI agent could no longer meet with Seiden unless Seiden's counsel was present, so the government and Seiden's counsel agreed

---

[10] To the extent that defendant also asserts that no wire fraud was committed because Seiden was working for the government at the time of the telephone call, that argument is addressed *infra* II.A.3 in connection with defendant's challenge to the sufficiency of the proof on Count Seven.

[11] As a basis for the doctrine of manufactured venue, the *Myers* court cited *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), in which the Second Circuit "rejected the Government's attempt to create federal jurisdiction by luring a defendant into placing a telephone call across a state line." 692 F.2d at 847 n.21.

that Seiden would make the trip to the EDNY on July 28, 2009. (Tr. 264-65, 290.) Additionally, by July 28, the phone company had not yet set up Seiden's phone to automatically record calls, so the FBI needed to use its own devices to record the call. (Tr. 292.)

Moreover, it was the defendant who sought out Seiden in order to speak with him. *See Naranjo*, 14 F.3d at 147 (no manufactured venue where co-conspirator "sought out" the government agent who was located in district by calling the agent repeatedly, and agent did not go to the district to create venue there). On July 28, 2009, defendant sent as many as six text messages to Seiden before Seiden called him back. (Tr. 846; Gvt. Exs. 10, 12B.)

Finally, when Seiden did call the defendant back, he informed the defendant at the beginning of the call that he was in New York. *See* Gvt. Ex. 5; *Rommy*, 506 F.3d at 124 (government agent's remark to defendant that agent was in New York when he called out-of-venue defendant alleviated concern that venue was "the product of some 'chance use of a telephone' by a government agent"). Defendant continued the conversation in an effort to further his ongoing conspiratorial goals. Moreover, as noted *supra*, defendant continued to try to contact Seiden by text message after the telephone call, still being told that Seiden was in New York. *See supra* note 6.

In sum, there is no evidence of manufactured venue in this case. The calls were made from EDNY because Seiden could only meet with the government with his counsel present. In any event, defendant tried to contact Seiden, knowing Seiden was in New York (purportedly to visit his sick mother), and then was told at the beginning of the critical July 28, 2009 conversation that Seiden was in New York. Knowing that

Seiden was in New York, defendant continued the telephone conversation in an effort to further his fraudulent scheme and then repeatedly texted and attempted to contact Seiden after that telephone call (while being told Seiden was still in New York) to continue the scheme. Under such circumstances, any claim for manufactured venue must fail.

### 3. Insufficiency Claim on Count Seven: Wire Fraud

Defendant challenges his conviction under Count Three, which charged the defendant with wire fraud pursuant to 18 U.S.C. § 1343. Defendant argues that he is "actually innocent" of wire fraud because Seiden's phone call from the EDNY on July 28, 2009 was not made "for the purpose of executing such scheme or artifice," but was rather made to "gain incriminating information" about the defendant, since Seiden was cooperating with the FBI at the time he made the phone call. As set forth below, this argument has no merit.

A defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden. *United States v. Thomas*, 377 F.3d 232, 237 (2d Cir. 2004) (citation omitted). The court must view the evidence in the light most favorable to the government and draw all permissible inferences in the government's favor. *See United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006).

The wire fraud statute makes it a crime to use wires in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "The essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of

the mails [or wires] to further the scheme.'" *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (quoting *United States v. Miller*, 997 F.2d 1010, 1017 (2d Cir. 1993)) (all alterations in *Dinome* and some alterations in *Miller*). The government does not need to prove that "the scheme successfully defrauded the intended victim," but "the government must show that some actual harm or injury was *contemplated* by the schemer." *Dinome*, 86 F.3d at 283 (quotations omitted).

In this case, the evidence clearly satisfied each of the three elements of wire fraud – namely, the defendant engaged in a scheme to defraud others of money or property, and he used the interstate wires to further that scheme. During the July 28, 2009 phone call, the defendant gave Seiden specific directions about how to manipulate the prices of UPDV and Alphatrade and confirmed that he would pay Seiden a kickback. *See* Gvt. Ex. 5. As a consequence of the defendant's scheme, buyers would purchase shares at artificially inflated prices so that defendant could sell his shares at a greater profit than he would otherwise have received. Such a consequence demonstrates defendant's intent to harm the buyers of UPDV and Alphatrade stock. As to the third element, no one disputes that the defendant used the interstate "wires" to discuss this scheme.

In satisfying each of these elements, it is the *defendant's* intent that is relevant, not Seiden's intent. *See United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1435 (S.D.N.Y. 1989) ("The relevant inquiry is whether the [communication] is part of the execution of the scheme as conceived by the perpetrator at the time' of the communication.") (citations omitted) (alteration in original). Thus, the defendant's argument that there was insufficient

evidence to support his conviction for wire fraud because Seiden called him to "gain incriminating information" and not to further the scheme, fails. The case defendant cites, *Victor Teicher & Co., L.P.*, 726 F. Supp. at 1435, is inapposite. In that case, a defendant, aware that the SEC was investigating him, called an employee and asked him to destroy evidence. The court held that the defendant did not make the phone call for the purpose of executing a scheme to defraud because he placed it after the scheme had ended. *Id.* Here, by contrast, the defendant intended to continue the scheme to defraud, and believed he was using the wires to further that scheme.

In fact, this specific argument asserted by defendant – that is, that the use of a government agent in a telephone call with the defendant makes the offense of wire fraud legally impossible – has been flatly rejected in several cases. For example, in *United States v. Hammond*, 598 F.2d 1008, 1010 (5th Cir. 1979), the Fifth Circuit upheld wire fraud convictions where "the wire fraud convictions were based on telephone calls between the defendant and [FBI] agent Pesiner in which they discussed the plans for defrauding the brokerage house." In reaching this decision, the Fifth Circuit rejected the defendant's argument that an individual who attempts a fraud with a government agent over the interstate wires is not guilty of wire fraud because it cannot be in furtherance of the scheme:

> The defendant's interpretation of § 1343 is incorrect. Section 1343 does not provide that the interstate or foreign communication must be "in furtherance of" the scheme to defraud. It only provides that the communication must be made "for the purpose of executing such scheme." 18 U.S.C. § 1343. And one

can certainly make a communication for the purpose of executing a scheme, even when that communication does not actually further the scheme . . . . When the defendant in this case talked on the phone with agent Peisner, the defendant was unaware that Peisner was an FBI agent. He thought of Peisner as his accomplice in the scheme, and in these phone calls, the defendant explained to Peisner exactly what he was supposed to do. Clearly, then, the defendant made these phone calls [i]ntending that they would help execute the scheme to defraud the brokerage house…. [T]his is sufficient to bring the calls within § 1343.

598 F.2d at 1010-11; *accord United States v. Patterson*, 528 F.2d 1037, 1041 (5th Cir. 1976); *see also United States v. Sanders*, 893 F.2d 133, 138 (7th Cir. 1990) ("[Defendant] maintains that a violation of the wire fraud statute necessarily requires proof that someone actually lost money or property as a result of the scheme. This position is untenable. The aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result. The scheme developed by [the defendant] put the risk of loss on the brokers; such a plan is an actionable fraud under the wire fraud statute." (citations omitted)).

Here, construed most favorably to the government, the evidence established that: (1) prior to July 28, 2009, defendant had agreed with Seiden to have Seiden fraudulently purchase UPDV stock at artificially inflated prices so that defendant (and Kainth) could sell his shares, in exchange for a 25 percent kickback to Seiden; (2) Seiden and the defendant engaged in a number of these trades

pursuant to the fraudulent scheme prior to July 28, 2009; (3) during a trip to Texas on July 15, 2009, Seiden explained to defendant all the details of his fraudulent technique (by pretending to be a customer of the brokerage firm when making trades and then placing unauthorized trades), and defendant tried to provide Seiden with more brokerage firms to call and make additional trades; (4) during the July 28, 2009 interstate telephone call, defendant discussed the scheme with Seiden and gave Seiden specific trade instructions regarding additional fraudulent purchases. This evidence was unquestionably sufficient to find the defendant guilty of wire fraud in connection with the July 28, 2009 telephone call.[12]

Defendant's main defense at trial (including during defendant's own testimony) was that he was not aware that Seiden was fraudulently inflating the price of UPDV; rather, according to defendant, he honestly believed that Seiden was creating demand in the stock, so that defendant could sell his shares at higher prices, through legitimate means. However, there was overwhelming evidence in the record that defendant knew that Seiden was using fraudulent means to inflate the stock price of UPDV.

First, although Seiden testified that he did not initially inform the defendant as to the precise fraudulent means he was utilizing to create the demand in the stock, it was abundantly clear from the circumstances surrounding the transaction that a fraudulent scheme was being used to place buy orders on the defendant's behalf. For example, although defendant claimed

---

[12] Although no specific challenge to the sufficiency of the evidence on the other counts was made in defendant's post-trial Rule 29 motion (other than venue), the Court concludes, in any event, that the above-referenced evidence also was sufficient to support convictions on Counts One and Two.

that he thought Seiden was placing buy orders in UPDV for the benefit of Seiden's clients, defendant knew the following: (1) Seiden was placing these buy orders for UPDV without any knowledge about UPDV or its operations (Tr. 399); (2) the defendant was instructing Seiden as to how many shares of the stock to buy and at what prices (Tr. 405, 407, 411); (3) at defendant's direction, Seiden would purchase the stock at a price higher than the price at which the stock was currently trading (Tr. 421-22); and (4) the defendant paid Seiden a 25 percent, secret kickback for placing the buy orders in UPDV, which totaled about $40,000 (Tr. 287-88, 401).

Second, not only was the fraudulent nature apparent from the circumstances surrounding the transactions, but Seiden also testified that he explicitly told the defendant during a trip to Texas on July 15 that he was placing the buy orders by falsely impersonating clients in calls to brokerage houses. (Tr. 445-46.) Seiden testified that the defendant was not surprised when he told him the details of the scheme, and offered the next day to try to find some new brokerage firms that could be victimized by this scheme. (Tr. 446-48.)

Third, Seiden's testimony was fully corroborated by the recordings he made with defendant following Seiden's arrest. During these calls, Seiden again made clear that he was using fraudulent means to place the purchases. For example, during the July 31, 2009 call, Seiden reminded the defendant that he had to be "cautious because of what I do" and that he was talking "outta my, my butt when I tell them who I am and everything." (Gvt. Ex. 9, at 2.) During these same recordings, the defendant gave Seiden instructions on what trades to make, at what prices, and discussed the 25 percent kickback to Seiden. Thus, the recordings alone offered devastating and overwhelming proof of the defendant's participation in the scheme and an awareness of its fraudulent nature.

Accordingly, defendant's challenge to the sufficiency of the evidence on the wire fraud offense contained in Count Seven is denied.[13]

### B. Motion for a New Trial

The defendant asserts four grounds on which he seeks a new trial pursuant to Federal Rule of Criminal Procedure 33: (1) there was a constructive amendment or prejudicial variance to the Superseding Indictment; (2) the government withheld witness statements in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (3) the government improperly introduced evidence of the defendant's prior bad acts in violation of Federal Rule of Evidence 404(b); and (4) the government misled the jury during its rebuttal summation. As set forth below, the Court finds these arguments to be without merit.

---

[13] The Court notes that, although defendant does not make a specific argument regarding manufactured jurisdiction (as opposed to manufactured venue) as to Count Seven, such an argument would also fail. The entire scheme up to July 28, 2009 (including prior to Seiden's July 21, 2009 arrest) was based upon a myriad of interstate telephone calls between Seiden in Florida and Abdallah in Texas. Moreover, prior to Seiden initiating the July 28, 2009 interstate telephone call, defendant had repeatedly attempted to make interstate contact with Seiden (including at least 6 text messages on July 28 prior to the 3:00 p.m. call from Seiden), with the defendant knowing that Seiden was going to be in New York, and thus defendant caused the interstate transmission from Seiden. In addition, as discussed *supra* II.A.2.b, Seiden told the defendant at the start of the call that he was in New York, thereby making the interstate nature of that particular call clear to defendant. Under these facts, no claim for manufactured jurisdiction could possibly lie even if it had been made by the defendant.

### 1. Legal Standard

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted), and only if there exists "'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134.

### 2. Claim of Constructive Amendment/ Prejudicial Variance

The defendant argues that there was a constructive amendment or prejudicial variance to the Superseding Indictment because, although the Superseding Indictment charges a conspiracy involving the shares of two companies between June and August of 2009, the government presented evidence at trial that the defendant was involved in a conspiracy as early as 2008 involving additional companies and other conspirators. The result, defendant argues, was to broaden the possible bases for conviction.

As set forth below, this argument is frivolous. There was no suggestion whatsoever during the trial that defendant was involved in any conspiracy or scheme with Seiden prior to June 2009; in fact, it was undisputed that Seiden did not meet with the defendant prior to June 2009. Instead, the evidence of Seiden's criminality prior to June 2009 was introduced to impeach the credibility of Seiden by showing that he had been involved in similar schemes long before even meeting with the defendant. In fact, not only was there no defense objection to this evidence being offered by the government, but defendant's counsel made extensive reference to this evidence in his opening and closing statements, and during his cross-examination of Seiden, to try to demonstrate that Seiden, as a habitual fraudster, had duped the defendant as well.

#### a. Applicable Law

The Fifth Amendment grants defendants the right to be tried only on charges contained in an indictment returned by a grand jury. "An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively." *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994); *see United States v. Mucciante*, 21 F.3d 1228, 1233 (2d Cir. 1994) ("Even if an indictment is not *actually* amended, the law recognizes that there are times when the government's presentation of evidence, together with the trial court's jury instructions, creates an unacceptable risk that the jury might convict the defendant of a crime materially different from the one alleged in the indictment.").

An indictment has been constructively amended "when the government's presentation of evidence and the district court's jury instructions combine to 'modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" *United States v.*

*Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (quoting *Clemente*, 22 F.3d at 482). The constructive amendment of an indictment is a "'*per se* violation[] of the Fifth Amendment that require[s] reversal even without a showing of prejudice to the defendant.'" *Vebeliunas*, 76 F.3d at 1290 (quoting *Clemente*, 22 F.3d at 482).

An *amendment* of the indictment occurs when the terms of the indictment are altered – literally, or in effect – *after* the grand jury has passed upon them. *See United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir. 1997). By contrast, "[a] *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* (quotations omitted). The most significant difference between a variance and a constructive amendment is that the latter is a *per se* violation of the Fifth Amendment, whereas "a defendant must show prejudice in order to prevail on a variance claim." *Id.* (quotations omitted). A defendant will fail to show that he has been prejudiced by the variance when "the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Mucciante*, 21 F.3d at 1236 (internal quotation marks omitted).

b.   Relevant Facts

A centerpiece of the defendant's defense at trial was attacking the credibility of cooperating witness Seiden. One of the main ways that defense counsel sought to undermine Seiden's credibility was to show that he was a habitual criminal who was defrauding brokers long before he ever met the defendant, and deceived the defendant as

well. Thus, the issue of Seiden's bad acts and criminality prior to meeting the defendant arose many times throughout the trial, including during both parties' addresses to the jury and during Seiden's direct examination.

For example, during its opening statement, the government, knowing that the defense would be focused on this issue, fronted the fact that Seiden had "engaged in illegal activity" for much of his ten years in the brokerage industry by accepting payments in return for placing "phony buy orders at brokerage firms in other stocks" in order to artificially inflate prices. (Tr. 31.) In an effort to show that Seiden deceived the defendant into participating in the fraud scheme, counsel for the defendant explained in his opening statement that Seiden was defrauding brokers long before meeting the defendant:

> This case is really about Eric Seiden. The government just outlined, very briefly, a number of years in which Mr. Seiden was not only stealing money but defrauding a number of individuals both privately and in the investment field. This case will be, as you see it develop, an individual who was successful in defrauding not only over 20 brokerage houses but hundreds of professional traders into believ[ing] that he was authorized to place buy orders for particular clients of those brokerage firms. You will find that this scheme that Mr. Seiden was involved in existed long before he ever met Mr. Abdallah. Mr. Seiden[] himself has and will tell you a record of his being a thief and liar. I suggest to you that the evidence is going to show that the primary issue in this case is the credibility of Eric Seiden. . . . You

will find that Mr. Seiden was a very successful individual in deceiving these people, but the issue is and you will find that he himself deceived Mr. Abdallah.

(Tr. 33-34.) Defense counsel later added:

The evidence will show and this is also important, that at the time they meet around early June of 2009, Mr. Seiden had already successfully perpetrated his scheme to defraud. He had it down pat. He was able to, because of his background and experience, deceive these professional brokers over the telephone.

(Tr. 38.)

On Seiden's direct examination, the government again sought to front the issue of Seiden's prior bad acts in light of the defense's clear attack on Seiden's credibility. Thus, Seiden testified that from 1996 to 2000 and from 2006 to 2008, he was paid kickbacks in exchange for persuading his clients to purchase stock in certain companies. (Tr. 326-27; 345-50.) Seiden also testified on direct that an individual named Jason D'Olivera paid him a kickback to create false demand for a stock so that D'Olivera and another individual named Craig Sizer could sell their shares in this company at a higher price. (Tr. 362-63.) Seiden generated this demand by calling brokerage houses and falsely identifying himself as the representative of an account holder who wanted to buy large blocks of stock. (Tr. 363-64.) Seiden would then cease contact with the firm without paying for the stock he had persuaded the firm to buy. (Tr. 363-64.) Seiden subsequently perpetrated the same impersonation scheme with three other individuals – Ray Dias, Ottie [Last

Name Unknown ("LNU")], and Dennis LNU – in April and May of 2009. (Tr. 372-75.)

On cross examination, Seiden was questioned extensively by defense counsel regarding his schemes to defraud brokerage houses prior to ever meeting the defendant. (Tr. 532-539.) For example, defense counsel asked:

Q. Clearly there were a number of victims between October 8th [2008] and the time you met with Mr. Kamal. Is that correct? And by "victims," I mean brokerage houses?

A. Yes, there were more than one.

(Tr. 534.) In fact, defense counsel listed the companies that Seiden defrauded prior to meeting the defendant. (Tr. 538-39.)

Finally, in his summation, defense counsel, again in an effort to argue that Abdallah was duped by Seiden, highlighted the fact that Seiden was victimizing brokerage houses long before any alleged conspiracy began with Abdallah. For example, defense counsel argued:

I did tell you earlier that the scheme was designed and created by who? Eric Seiden. It wasn't Mr. Abdallah. It wasn't Roger Kainth. Eric Seiden after years of deceiving people and stealing money finally finds himself out of a job in 2008. But this manipulator, this creative thief, he, he came up with a new one. He came up with his own idea how to defraud the brokerage houses. And he did it for many months before he ever met Mr. Abdallah. He couldn't even remember on cross-examination all of the firms that he had victimized

before meeting Mr. Abdallah. He had to be shown a document that said, oh, yeah, I remember that in November. And I remember that in September of '08. Oh, yeah, I remember that in May of '09. I, yeah, I remember that in June of '09 before I met Mr. Abdallah. But he did admit that he admitted to that he had committed his scheme to defraud well before he meets Mr. Abdallah.

(Tr. 1502.)

### c. Application

Defendant attempts to argue that the evidence of Seiden's scheme to defraud brokerage houses prior to meeting the defendant constituted a constructive amendment or variance from the charges in the indictment. That claim is utterly without merit.[14]

First, there was no constructive amendment of the indictment because there was no "substantial likelihood" that the defendant was convicted of an offense other than the offenses charges in the Superseding Indictment. *See Vebeliunas*, 76 F.3d at 1290. Although Seiden testified as to his prior conspiracies to defraud brokerage houses in which Seiden had participated, neither Seiden nor the government ever suggested that the defendant was involved in Seiden's earlier schemes. Moreover, it was

undisputed that Seiden had not even met the defendant at the time he was involved in this prior fraudulent conduct. In fact, defendant did not object to this evidence being offered; rather, his counsel referred to this prior criminal conduct by Seiden – in his opening, his cross-examination of Seiden, and in his closing – to try to demonstrate that Seiden was a career fraudster who had also deceived the defendant. In short, it was abundantly clear to the jury that there was no allegation in the indictment, or anywhere else, that the defendant had engaged in any of Seiden's fraudulent activities prior to the conspiracy alleged in the indictment, which began when Seiden first spoke to the defendant in June 2009 and involved a particular stock, UPDV, and later expanded to Alphatrade.

For the same reasons, there was no prejudicial variance. As noted above, the government offered no evidence that the defendant was involved in Seiden's previous bad acts, which occurred before Seiden ever met the defendant. Instead, the government's evidence against the defendant related solely to the charges in the indictment – namely, beginning in June 2009, Seiden and defendant engaged in a scheme to create false demand in UPDV and that the scheme later involved a second stock called Alphatrade. Thus, the evidence offered at trial did not prove facts materially different from those alleged in the indictment.

Accordingly, defendant's motion for a new trial based on constructive amendment of, or variance from, the Superseding Indictment is denied.

### 3. The *Brady* Claim

Defendant also argues that the Court should grant his Rule 33 motion because the government failed to disclose, and delayed

---

[14] As a threshold matter, defendant's suggestion that he was surprised by this evidence is meritless. It is clear from the trial record that the defendant learned about Seiden's prior conspiracies through the material the government provided to the defense pursuant to 18 U.S.C. § 3500. In fact, as noted *supra*, it is obvious from defense counsel's opening remarks to the jury that defendant not only knew about Seiden's previous stock fraud schemes, but that defendant's strategy centered on emphasizing Seiden's past criminality. *See, e.g.*, Tr. 32 ("This case is really the case about Eric Seiden.").

disclosure of, exculpatory information that was in its possession and thereby violated the defendant's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. In particular, the defendant argues that the government withheld statements or reports by Jason D'Olivera, Craig Sizer, Roger Kainth, Ray Diaz, Dennis LNU, Ottie LNU, and others. The defendant alleges that these individuals were interviewed by the FBI "on how they became involved in the scheme with Eric Seiden and how Eric Seiden devised the scheme involving the selling of the stock." (Defendant's Motion for a New Trial, at 12.) As discussed below, this argument is without merit.

### a. Applicable Law

Cases subsequent to *Brady* have elucidated three requirements for "'a true *Brady* violation'": first, "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching'"; second the "'evidence must have been suppressed by the [prosecution], either willfully or inadvertently'" and third, "'prejudice must have ensued.'" *United States v. Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)) (alteration in *Douglas*). The third requirement is also sometimes labeled the "materiality" requirement and asks whether, had the information been disclosed, there was a "reasonable probability of a different result." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (quotations omitted); *see Strickler*, 527 U.S. at 289-90.

The Second Circuit "has frequently recognized [that] 'evidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (quoting *United States v. Gonzalez*, 110 F.3d 936, 944) (2d Cir. 1997). Moreover, "[t]he government's duty to disclose is not limited to 'exculpatory' information, it also includes information that could be used to impeach government witnesses, so-called *Giglio* material." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

However, even where the government learns of exculpatory information during an interview, the government satisfies its *Brady* obligations by informing the defendant that the witness may possess exculpatory evidence. *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989); *see also United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (government not required to turn over grand jury testimony where government had informed defense that witness may have provided exculpatory evidence to the grand jury); *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (government not required to turn over grand jury testimony where defendant "was on notice of the facts necessary for him to take advantage of such [potentially] exculpatory testimony"); *United States v. Upton*, 856 F. Supp. 727, 751 (E.D.N.Y. 1994) ("[T]he government has provided defendants with the names of the grand jury witnesses who might have given exculpatory testimony, and hence the government has fulfilled its *Brady* obligations.")

### b. Application

Defendant's *Brady* claims have no merit. First, the government did not interview Jason D'Olivera, Craig Sizer, Ray Diaz, Dennis LNU and Ottie LNU. Thus, as to these individuals, the government did not have any interview notes that it could produce to the defendant. *Upton*, 856 F. at

746 ("[t]he government is under no obligation to turn over that which it does not have"). More than ten days before the trial began, however, the government gave to the defense two FBI reports concerning Seiden that disclosed Seiden's previous fraudulent schemes to create buying activity in various stocks with others including D'Olivera, Sizer, Diaz, Dennis LNU and Ottie LNU. These disclosures, which were made pursuant to 18 U.S.C. § 3500, satisfied the government's *Brady/Giglio* obligations because they informed the defendant about Seiden's involvement with these individuals. *See Salerno*, 868 F.2d at 542; *Grossman*, 843 F.2d at 85; *LeRoy*, 687 F.2d at 619. Having received this *Brady/Giglio* information, defendant was free to interview or call these individuals if he wished. Moreover, there is absolutely no evidence that any of these individuals had exculpatory evidence. There was no evidence at trial, or even an allegation, that any of these people knew or interacted with the defendant, or even dealt with Seiden when the conspiracy between Seiden and the defendant allegedly began in June 2009. Thus, it is sheer speculation that these individuals would have had any testimony favorable to the defendant. In short, defendant has failed to demonstrate that any *Brady* violation occurred with respect to the government's possession of any information regarding these individuals, or that he was prejudiced in any way even assuming *arguendo* a violation had occurred.

Second, with respect to Roger Kainth, the government notified defense counsel, by letter dated October 6, 2010, that the defendant may wish to interview Roger Kainth. *See* Letter from Loretta E. Lynch, United States Attorney, to Robert P. LaRusso, Esq. (Oct. 6, 2010), ECF No. 49 ("Pursuant to its obligation under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the government hereby notifies you, in an abundance of caution, that the defendant may wish to speak to Roger Kainth."). The government's failure to turn over any notes that may exist concerning the government's interview with Kainth does not constitute a *Brady* violation. This letter, provided to counsel more than four months prior to trial, was sufficient to satisfy the government's *Brady* obligation. *See Salerno*, 868 F.2d at 542; *Grossman*, 843 F.2d at 85; *LeRoy*, 687 F.2d at 619. In fact, as confirmed at oral argument with the defendant, the defense did interview Kainth and chose not to call him as a witness. Thus, not only was there no *Brady* violation, but defendant could not possibly demonstrate any prejudice from any alleged violation. *See, e.g.*, *United States v. Schledwitz*, Nos. 95-5309, 95-5409, 1995 WL 712755, at *5 (6th Cir. Dec. 4, 1995) (rejecting argument that government's failure to turn over FBI 302 report was a *Brady* violation that constituted a denial of a fair trial, where defendant's counsel interviewed the witness prior to trial and chose not to call him). Accordingly, where the government provided the *Brady* letter and defendant interviewed the witness and chose not to call him, no *Brady* violation exists.

Thus, the Court finds that the government did not violate the defendant's due process rights under *Brady* or its progeny.

### 4. The 404(b) Claim

The defendant argues that the government violated Federal Rule of Evidence 404(b) by introducing evidence of the defendant's prior crimes for the impermissible purpose of demonstrating the defendant's criminal propensity. *See* Fed. R. Evid. 404(b). The defendant contends that, in presenting this evidence, the prosecution

exceeded the bounds of pre-trial authorization it received from the Court concerning the Rule 404(b) evidence, and that the Court failed to give a "curative" instruction as to the proper uses of the Rule 404(b) evidence. As discussed below, the Court finds these arguments to be meritless. As a threshold matter, the Court notes that there was no objection by defense counsel to any of these areas of cross-examination of the defendant during the trial. In any event, even if there had been an objection, the Court would have overruled the objection because such questioning was permissible. First, all of this evidence was properly admitted to rebut statements made by the defendant during his direct testimony, as well as under Rule 404(b) on the issues of knowledge, intent, and motive.[15] Moreover, pursuant to Rule 403 of the Federal Rules of Evidence, the probative value of all of the evidence discussed below was not substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or any of the other Rule 403 grounds.

---

[15] The Court also concludes that this evidence could have been offered as background to the conspiracy under well-settled Second Circuit case authority. As the Second Circuit has repeatedly noted, "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). All of this evidence was inextricably intertwined with, and provided background to, the charged crimes.

a. Applicable Law

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). However, the Rule then provides that it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan knowledge, identity, absence of mistake, or lack of accident." *Id*. "The Second Circuit's 'inclusionary approach' to the admission of other act evidence 'allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity.'" *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (quoting *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (per curiam)). Under this standard, the Second Circuit has repeatedly held that such evidence is admissible to demonstrate, among other things, the motive and/or intent of the defendant in committing the charged crime, or that the defendant had knowledge of the crime. *See, e.g., United States v. Newsom*, No. 09-3406-cr, 2011 U.S. App. LEXIS 19127, at *4 (2d Cir. Sept. 16, 2011) (other acts evidence properly introduced to demonstrate intent); *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007) (other acts evidence properly introduced to demonstrate knowledge); *United States v. Earls*, 157 Fed. App'x 421, 422 (2d Cir. 2005) (evidence that defendant participated in two prior similar investment schemes properly admitted to show defendant's motive and intent to defraud investors); *United States v. Myerson*, 18 F.3d 153, 166 (2d Cir. 1994) (other acts evidence properly introduced to show intent); *United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991) (no error in introducing other acts evidence to demonstrate intent).

Of course, the admission of such evidence for these other purposes is still subject to the balancing of Fed. R. Evid. 403. *See United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (finding prior acts evidence admissible for purposes other than showing criminal propensity "as long as it is 'relevant to some disputed issue in the trial' and satisfies the probative-prejudice balancing test of Fed. R. Evid. 403") (quoting *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980)). Thus, in considering the admissibility of such evidence, the Court should consider whether (1) the evidence is being offered for a proper purpose, (2) the evidence is relevant to a material issue in dispute, and (3) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. *See Guang*, 511 F.3d at 121; *accord Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). Moreover, the Court should give the jury an appropriate limiting instruction concerning the proper use of that evidence, if such a request is made by the defendant. *See Guang*, 511 F.3d at 121; *Huddleston*, 485 U.S. at 691-92; Fed. R. Evid. 105.

The district court also has broad discretion in determining what issues may be raised on cross-examination for the purpose of impeaching the credibility of a witness. *See, e.g.*, *Lewis v. Baker*, 526 F.2d 470, 475 (2d Cir. 1975) ("It is well-settled that the trial judge is accorded great discretion in his assessment of the matters which should properly be raised on cross-examination as bearing on the credibility of a party or witness."). Pursuant to that discretion, there is no rule of law that requires the prosecution to watch idly as a defense witness, including the defendant himself, affirmatively lies about a relevant fact during his direct testimony. Instead, subject to the Rule 403 balancing test, the prosecution is entitled to cross-examine the defendant regarding misrepresentations of fact made by the defendant during his direct testimony, so as to avoid the jury being misled and to permit the jury to properly assess his credibility. In other words, as the Second Circuit has repeatedly emphasized, "'[w]hen a defendant takes the stand, the [g]overnment [is] permitted proper and effective cross-examination in an attempt to elicit the truth.'" *United States v. Garcia*, 936 F.2d 648, 653 (2d Cir. 1991) (quoting *United States v. Havens*, 446 U.S. 620, 627 (1980)); *accord United States v. Garcia*, 900 F.2d 571, 575 (2d Cir. 1990). Thus, if a defendant puts "certain activity in issue by offering innocent explanations for or denying wrong-doing, the government is entitled to rebut by showing that the defendant has lied." *United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993).

b.   Defendant's Conversion of Preferred B Shares

Defendant contends that the Court improperly permitted the government to cross-examine him regarding the defendant's conversion of Preferred B shares, and inconsistencies in SEC documents and filings regarding that conversion. As discussed below, that argument has no merit. The cross-examination was permissible to rebut defendant's claims in his direct testimony as to the nature and purpose of that conversion. In any event, the cross-examination was also permissible to show defendant's motive and intent as to the charged offense, because it was the government's theory, *inter alia*, that the defendant misappropriated most of the 600 million shares immediately prior to his resignation from UPDV, and then sent them overseas in anticipation of trying to find a way to sell the stock.

### i. Relevant Facts

On October 27, 2008, the defendant sent an email to the transfer agent for UPDV directing him to "issue 600 million shares of UPD[V] in 4 [c]ert[ificates] each 150 million shares to: Mohamed Abdellatif Yassine" at AM Financials in Beirut, Lebanon. (Tr. 305; Gvt. Ex. 98.) The defendant explained that the 600 million shares should be issued because the defendant was converting the "15,000" Preferred B shares he had received on December 27, 2007. On direct examination, defendant claimed that the 600 million shares rightfully belonged to him, and that he sent them to investors overseas in order to increase liquidity in the UPDV market and to raise capital for the company. (Tr. 1132, 1170-71, 1185.)

On cross-examination, the government questioned the defendant as to why the UPDV Form 10K annual report for 2007, which defendant had signed and certified to be accurate, indicated that defendant had received 1,500 shares of Series B Preferred Shares, and also indicated that as of April 21, 2008, UPDV had issued a total of only 8,858 shares of Series B Preferred Stock, making it impossible for defendant to own 15,000 of these shares by December 27, 2007. (Tr. 1247, 1249, 1251-52.) The government also questioned the defendant regarding Form 4, which defendant had signed and filed with the SEC on April 21, 2008, also indicating that defendant had received 1,500 Preferred B shares on December 27, 2007. (Tr. 1228-30.) The defendant reported in Form 4 that these 1,500 Preferred B shares could be converted into 20,000 shares of UPDV common stock for a total of 30 million common shares. (Tr. 1229-30.)

### ii. Application

This Court properly concluded that the government was entitled to challenge the defendant's credibility on cross-examination concerning the obvious discrepancies between the defendant's testimony, in which he claimed to have rightfully owned 15,000 Preferred B shares, and the SEC filings, which indicated that the defendant owned one-tenth of that number of shares. *See Beverly*, 5 F.3d 633 at 639; *see also Garcia*, 936 F.2d at 653 ("where a defendant testifies on direct examination regarding a specific fact, the prosecution may prove on cross examination that [the defendant] lied *as to that fact*") (citations and quotations omitted) (emphasis in original); *United States v. Cuadrado*, 413 F.2d 633, 635 (2d Cir. 1969) ("Where a defendant in his direct testimony falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied *as to that fact* . . . . There is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (citations and quotations omitted)); *accord United States v. Kunkel*, No. 08-3769-cr, 2009 WL 39351, at *1 (2d Cir. Jan. 8, 2009) ("The purportedly objectionable testimony was relevant under Rule 401 because it tended to show that [the defendant] testified falsely in this case. . . . And given that the testimony was largely an elaboration of other testimony admitted without objection, any risk of prejudice was small.");

In any event, the evidence concerning the misappropriation of the 600 million shares was also properly admitted under Rule 404(b) because it went to the issue of the defendant's motive. In particular, based upon the government's theory of the case, the evidence that defendant moved 600

million shares to a nominee account overseas was highly probative of defendant's strong motive to boost UPDV's stock price so that he could profit from selling these shares.

Accordingly, the cross-examination of the defendant as to this conversion of stock – including the amounts, the reasons for it, and the discrepancies in its characterization on public filings – was properly admitted to rebut his testimony on direct, as well as on the issues of motive and intent under Rule 404(b).

### c. Cross-Examination of Defendant Regarding Bounced Checks

Defendant also argues that the government improperly cross-examined him regarding certain bounced checks. In October 2008, after the defendant took $4 million dollars from a Geer operating account, Geer bounced checks to its suppliers in the amount of $2.5 million. As a threshold matter, the government provided notice to the Court and the defendant that it intended to introduce evidence concerning the bounced check by Geer under Rule 404(b), and defendant indicated that he would not oppose the motion. *See* Letter from Robert P. LaRusso, Esq. to the Hon. Joseph F. Bianco (Dec. 6, 2010), ECF No. 67 ("After receipt of the motion, we conducted a preliminary examination of the government's allegations. Though we will be requesting additional time to acquire documentation concerning the 'other act evidence' and to interview individuals knowledgeable about the alleged misconduct, we have decided to not oppose the government's motion. This decision was made after sufficient consultation with my client Kamal Abdallah ('Abdallah'), who consented to our present position. Though we disagree with the factual presentation and conclusions drawn by the government,

we do not object to the introduction of the other act evidence presented in their motion.")[16] In any event, as set forth below, this cross-examination was likewise properly admitted to rebut defendant's direct testimony regarding how he used the Geer money and under Rule 404(b).

On direct examination, the defendant claimed that after he took the $4 million dollars from Geer, he put $1 million dollars back into Geer, and Sheridan placed an additional $3.5 million into Geer after he resigned. (Tr. 1098.) The defendant then explained that "what was taken from the companies was three-and-a-half. What went back into the companies was four-and-a-half million. . . . So the companies, after the injection, they were safe and sound." (Tr. 1098.)

The evidence concerning the bounced checks was properly admitted as impeachment evidence to challenge the defendant's credibility. Defendant claimed that Geer was "safe and sound," when in fact the evidence of the bounced checks demonstrated that, after defendant took millions of dollars from Geer, Geer was unable to pay its suppliers. *See Lewis v. Baker*, 526 F.2d at 475; *Garcia*, 936 F.2d at 653.

Moreover, this evidence was properly admitted as substantive evidence because it was relevant to the defendant's motive, knowledge, and fraudulent intent. The evidence that Geer, a UPDV subsidiary, was bouncing checks provided highly probative evidence that defendant was aware of financial problems at UPDV, which goes to

---

[16] Defense counsel's letter specifically mentioned the government's evidence regarding the bounced checks. *See* Letter from Robert P. LaRusso, Esq. to the Hon. Joseph F. Bianco (Dec. 6, 2010), ECF No. 67, at 2-3 (referencing the bad checks).

defendant's motive to enter the scheme to defraud and his willingness to pay Seiden to create false demand for the shares. Similarly, the evidence concerning the $2.5 million shortfall at Geer provided probative evidence that defendant knew that UPDV was not a good investment at the time he hired Seiden. The defendant's knowledge that UPDV was a poor investment also would help demonstrate defendant's fraudulent intent, since it undermines the defendant's claim that he thought Seiden was legitimately promoting UPDV to customers.

In sum, the cross-examination regarding the bounced check was proper to rebut defendant's direct testimony regarding the use and impact of the Geer loan and, in any event, was proper under Rule 404(b).

### d. Cross-Examination of Defendant Regarding UPDV's Disclosures

The defendant also argues that the government improperly accused him of engaging in the crime of insider trading. On cross-examination, the government questioned the defendant as to whether he or anyone else at UPDV ever notified UPDV's shareholders as to certain events, such as UPDV's default on $14 million in loans. (Tr. 1288-89.) As set forth below, this questioning was proper to rebut defendant's statement on direct, as well as on the issue of defendant's knowledge, motive, and intent.

First, on his direct examination, defendant specifically testified that he did not have any inside information when making any trades. In particular, defendant sought to explain his innocent motive in buying and selling UPDV stock in 2009. (Tr. 1160-61.) During that portion of his direct testimony, defendant stated, "To my knowledge, there is no laws that prohibit

buying and selling stock. As long as you don't have inside information and I didn't have any inside information." (Tr. 1161.) Because defendant testified explicitly under oath that he "didn't have any inside information," the government had the right to cross-examine him on the veracity of that very specific statement by pointing out certain information about the financial condition of the company to which only the defendant was privy.

Second, the line of questioning concerning the non-disclosure of these material events was properly admitted for the purposes of showing motive, fraudulent intent, and knowledge. Specifically, the evidence was highly probative to show that the defendant had a motive to sell as many of his UPDV shares as possible through the alleged fraudulent scheme before news of UPDV's debt-ridden state became publicly known. These questions also went to the defendant's knowledge of the stock fraud scheme and his intent to defraud because it allowed the government to demonstrate that the defendant had to have known that Seiden was deceiving his clients into buying UPDV stock, since these clients would not have bought the stock if they were aware of the company's financial condition. Finally, it allowed the government to rebut defendant's good faith argument by demonstrating that defendant knew, when he hired Seiden to get others to buy UPDV shares, that fraud had to take place in connection with such sales because of UPDV's dire financial condition. Accordingly, defendant's contention that this line of questioning was improper is without merit.

### e. Limiting Instruction

Finally, although defendant claims that the Court failed to give a limiting instruction with respect to Rule 404(b), the defendant is simply incorrect. In fact, the Court gave

such an instruction on three separate occasions. First, during the trial testimony, the Court gave a limiting instruction to make clear that evidence regarding the breach of the loan agreements with Sheridan could only be considered as to background to the crimes charged in the indictment, as well as on the issues of motive and intent. (Tr. 822-23.) Second, immediately following the government's summation (even though there was no objection from the defense), the Court *sua sponte* offered to give a limiting instruction, regarding the government's reference in the summation to the fact that the defendant was privy to inside information about the company that others were not, to ensure (in an abundance of caution) that the jury understood that there is no insider trading charge and that such evidence was only relevant on the issue of knowledge and intent. (Tr. 1481-82.) Defense counsel accepted the Court's offer and the Court immediately gave the jury the following instruction:

> Members of the Jury, before Mr. LaRusso begins his summation, I just want to give you an instruction regarding some evidence you heard during the trial and a reference that was made during the Government's summation. There was a reference both during the trial and I think in the Government's summation to insider information or insider trading, and I want to make sure there's no misunderstanding regarding this and it's crystal clear: *The defendant is not charged with insider trading. There are no allegations in the indictment that relate to insider trading. Insider trading is not something that you're considering, it's not part of this case. I can't be clearer on that.* The scheme that's charged in the

indictment relates solely to an alleged fraudulent scheme to create false demand for UPDV and Alphatrade common stock to increase the stock price so that the stock could be sold at a price that was artificially increased due to the fraudulent activity. That's the scheme that's in the indictment. You're going to get a copy of the indictment in the jury room. That's the only scheme that's charged in this case and the only scheme that you are considering. These other evidence and these arguments regarding what information was or was not given to Mr. Seiden by the defendant regarding these companies may only be considered on the issue of knowledge and intent as it relates to the scheme that's charged in the indictment. That's the only purpose that you may consider it for and not for any other purpose. And this is extremely important. I gave you, as you'll recall, a similar instruction, as you heard, that is during the trial, regarding the loan agreements. And that same instruction applies here as well. When you hear my instructions on the law in a moment, I'm going to repeat that charge to you to make sure you understand the limited purpose for which those, that evidence is being permitted and that you can't consider it for any other purpose, okay?

(Tr. 1486-87.) (emphasis added). Finally, during the instructions to the jury at the end of the case, the Court repeated the 404(b) limiting instruction. Thus, given that instruction, there could not have been any confusion by the jury regarding the scope of the charges in the Superseding Indictment, and the limited purpose for which they could

consider this other evidence.

### 5. Rebuttal Summation

The defendant argues that the prosecution, in its rebuttal summation, intentionally misled the jury into thinking that the defendant had insider information that UPDV was going out of business because the defendant's cell phone bill was sent to UPDV. As set forth below, that argument is without merit.

#### a. Applicable Law

In order to prevail on a motion for a new trial based on prosecutorial misconduct, defendants bear the "heavy burden" of demonstrating that the alleged misconduct is "so severe and significant as to result in the denial of their right to a fair trial." *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). During a jury summation, the "government has broad latitude in the inferences it may reasonably suggest to the jury." *United States v. Williams*, 205 F.3d 23, 35 (2d Cir. 2000) (quoting *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989), *cert. denied* 493 U.S. 1081 (1990). A court "'will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation.'" *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir. 1987) (quoting *United States v. Cruz*, 797 F.2d 90, 93 n.1 (2d Cir. 1986)). Even summation comments found to be improper will not result in a denial of the defendant's due process rights unless the statements caused "substantial prejudice" to the defendant. *Casamento*, 887 F.2d at 1189. To determine whether the defendant suffered substantial prejudice, courts look at "the allegedly improper statements in the context of the prosecutor's entire argument to the jury." *Id.*

#### b. Relevant Facts

In its rebuttal summation, the government argued that the defendant was aware in June 2009 of UPDV's dire financial condition, which motivated him to unload UPDV shares as quickly as possible through the fraud scheme with Seiden. In an effort to demonstrate defendant's knowledge of UPDV's financial condition, the government introduced an exhibit showing that the cell phone billing address for the defendant's cell phone was the same as UPDV's corporate address, except that the suite number was different. The exhibit also indicated that the defendant's cell phone contract had been accepted on May 17, 2009. (Tr. 224, Gvt. Ex. 11.) The government stated in the summation that there were "some documents in evidence" that "proved that the defendant was more involved in the company than he let on." (Tr. 1609.) At this point, the government showed the cell phone records to the jurors and pointed out that the bill had been sent to UPDV's corporate address, and that according to the payment history, UPDV had paid several thousand dollars for the defendant's cell phone. (Tr. 1610.)

#### c. Application

As discussed by the Court in detail on the record, the government's inference that UPDV was paying the defendant's cell phone bill in May 2009 was reasonable and proper argument.[17] (Tr. 1629-1632.) In any event, even if the inference was improper, it did not prejudice defendant's case in light of the overwhelming evidence indicating defendant's knowledge in June 2009 that UPDV was in dire financial condition. This evidence included defendant's admissions on cross-examination that after October

---

[17] The defendant did not challenge the cell phone bill when it was admitted into evidence.

2008: (1) UPDV and Continental Fuels stopped making payments on their loans with Sheridan; (2) UPDV owed Sheridan $14 million dollars; (3) UPDV did not have the cash to pay back Sheridan; and (4) Sheridan had the right to foreclose on the loans. (Tr. 1277-81.) The government made all of these points during its rebuttal summation. (Tr. 1605, 1611.) Reviewing the government's statements about the defendant's cell phone "in the context of the prosecutor's entire argument to the jury" demonstrates that the inferences drawn from the cell phone bill did not prejudice the defendant's case. *See Casamento*, 887 F.2d at 1189. Accordingly, defendant's motion for a new trial on the grounds of prosecutorial misconduct in the rebuttal summation is denied.

### III. CONCLUSION

For the reasons set forth above, the defendant's motion for a judgment of acquittal and motion for a new trial are denied in their entirety.

SO ORDERED.

_____
Judge Joseph F. Bianco
United States District Judge


Date:        January 6, 2012
             Central Islip, NY

*   *   *

The attorney for the government is Loretta E. Lynch, United States Attorney, by David C. Woll, Jr., 271 Cadman Plaza East, Brooklyn, NY 11201. The defendant proceeds *pro se*.